Elaine Murphy **COLEMAN** as Guardian Ad Litem of Lisa Rose Murphy, Stacy Murphy, and Kelly Murphy, minors, and individually in her own right, Plaintiffs,

v.

**STATE OF NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Wilma Acevedo and Letitia Pellot, defendants.**

No. CIV.A. 01–5740(JEI).

United States District Court, D. New Jersey.

March 3, 2003.

F. Michael Daily, Jr., LLC, Westmont, NJ, for Plaintiffs.

David Samson, Attorney General of New Jersey by Jacqueline Augustine, Esq., Deputy Attorney General, Richard J. Hughes, Justice Complex, Trenton, NJ, for Defendants.

## OPINION

IRENAS, Senior District Judge.

Presently before the Court is Defendants', State of New Jersey Division of Youth and Family Services, and caseworkers Wilma Acevedo and Letitia Pellot, Motion for Summary Judgment. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367. For the reasons set forth below, we will grant Defendants' Motion for Summary Judgment.

## I.

Elaine Coleman ("Coleman") was the subject of an investigation by the State of New Jersey Division of Youth and Family Services ("DYFS"). On September 30, 1999, responding to an anonymous complaint, two DYFS caseworkers, Wilma Acevedo ("Acevedo") and Letitia Pellot ("Pellot")(collectively "caseworkers"), arrived at Coleman's residence to investigate the possible neglect of Coleman's minor children, Lisa Rose Murphy, born May 18, 1990, Stacy Murphy, born August 26, 1988, and Kelly Murphy, born July 13, 1985.[1]

---

1. These three children are from Coleman's marriage to Joseph Murphy. On March 7, 1993, Joseph Murphy committed suicide. On

Upon arriving at the door to Coleman's residence [2] the caseworkers, who identified themselves as being from DFYS, were greeted by Coleman. Coleman told the caseworkers to wait while she put her two (2) dogs away and then allowed the caseworkers to enter the home. When, according to Coleman, she inquired as to the purpose of the caseworkers' visit, the Hispanic caseworker responded "we have received complaints today about you." (Pls.' Answer to Interogs. ¶ 14). To this Coleman asked, "what, you have questions about my inability as a mother?" (Id.). The Hispanic caseworker responded, "a caller has reported that you are on drugs, that you have no food, that you abuse your children and your children are dirty." (Id.).[3]

Coleman told the caseworkers that the home was not dirty. The Hispanic caseworker responded, "well we have to see your refrigerator and your kitchen cabinets to see if you have food for the children, we need proof." (Id.). Following an inspection of the kitchen and a secondary refrigerator, the caseworkers indicated that they were unsatisfied and that they would need to discuss matters further. At this point, Coleman telephoned her parents asking that they come to her home.

While the caseworkers were still in the kitchen, an exchange took place between the caseworkers and Coleman regarding her daughter Kelly. According to Coleman, one of the caseworkers stated, "we understand your daughter, Kelly was sexually molested three years ago and you didn't report it." (Id.). Coleman informed the caseworkers that the incident of molestation had been reported. Coleman then exited the kitchen to retrieve the business card of the police detective who conducted the investigation.

Upon Coleman's return, a caseworker stated, "we also understand that you were caught with another man and your husband committed suicide." (Id.). Coleman responded by telling the caseworkers, "that is the farthest from the truth." (Id.).[4]

Continuing their investigation, the caseworkers demanded that they be allowed to: (1) inspect the children's bedrooms; (2) interview with all three children; [5] and (3) have Coleman submit to a drug test. Coleman, upon the advice of her parents, refused to submit to drug testing without first speaking with a lawyer. The caseworkers responded, stating that they would return to Coleman's home to interview her husband. Coleman's father then told the caseworkers that on subsequent visits the caseworkers would not be let in the house. The caseworkers stated that they would be let in and, if necessary, they would return every day thereafter. The caseworkers then departed Coleman's residence.[6]

June 1, 1996, Coleman married Paul Coleman, with whom she currently lives.

2. When the caseworkers arrived at the Coleman residence, both Coleman and Stacy were present. From inside the house, Stacy noted that a Black woman and an Hispanic woman were getting out of a car and approaching the home.

3. Stacy was present during the entire exchange between Coleman and the caseworkers.

4. These statements were made in the presence of Stacy who, upon hearing them, ran upstairs to her room.

5. Both Stacy and Lisa were interviewed in private by the caseworkers.

6. As a result of this incident, Coleman's three children voluntarily sought counseling citing distress, anguish, and a breakdown in the relationship between themselves and Coleman.

Based on the foregoing events, Coleman, individually and as the natural parent and guardian *ad litem* of Lisa Rose Murphy, Stacy Murphy, and Kelly Murphy (collectively "Plaintiffs") filed a lawsuit against DYFS, and DYFS caseworkers Acevedo and Pellot alleging that the DYFS caseworkers' actions violated Plaintiffs' constitutional rights. Specifically, Plaintiffs allege *inter alia;* (1) a violation of their right to familial integrity; (2) racial discrimination in violation of the Equal Protection Clause; and (3) a violation of their Fourth Amendment right to be free from unreasonable searches.

On December 7, 2001, Defendants removed the case to this Court. On October 18, 2002, Defendants filed the instant Motion for Summary Judgment. Defendants assert that they are (1) entitled to qualified immunity, and that (2) in their official capacity, they are not "persons" within the meaning of 42 U.S.C. § 1983 and therefore Plaintiffs' section 1983 claims must be dismissed.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248, 106 S.Ct. 2505. (internal quotations and citations omitted).

## III.

Plaintiffs do not clearly indicate under what authority they bring their civil action for monetary damages stemming from the alleged constitutional violations. However, given the claims, we will treat Plaintiffs' Complaint as a 42 U.S.C. § 1983 claim.[7] To establish a claim under section 1983, a plaintiff must demonstrate a violation of a right protected by the Constitution or laws of the United States that was committed by a person acting under the color of state law. *See Kneipp v. Tedder,* 95 F.3d 1199, 1204 (3d Cir.1996). The first step in evaluating a section 1983 claim is to "identify the exact contours of the underlying right said to have been violated" and to determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." *County of Sacramento v. Lewis,* 523 U.S.

---

**7.** 42 U.S.C. § 1983 provides, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution or laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia." 42 U.S.C. § 1983 (2002).

833, 841, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

Defendants contend that, as government officials engaged in discretionary functions, Acevedo and Pellot are entitled to qualified immunity from suits brought under 42 U.S.C. § 1983. See *Sherwood v. Mulvihill*, 113 F.3d 396, 398–99 (3d Cir.1997). An individual is immune if his or her conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 399 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Where a defendant asserts this defense in a motion for summary judgment, the plaintiff has the initial burden to prove that the defendant's conduct violated some clearly established right. *Id.* Thus, the inquiry must begin with the question of whether the plaintiff's allegations are sufficient to establish "a violation of a constitutional right at all." *Id.* (citation omitted). Only if the plaintiff carries this initial burden must the defendant then demonstrate that the defendant had an objectively reasonable belief in the lawfulness of his or her conduct. *Id.*

### A.

■ Count I, of Plaintiffs' Complaint, rests on an alleged violation of familial integrity. It is well established that parents have a protected liberty interest in the custody, care and management of their children. See *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); *Croft v. Westmoreland County Children and Youth Services*, 103 F.3d 1123 (3d Cir.1997). However, this parental interest is not absolute. *Id.* at 1125. "Indeed, this liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children——particularly where the children need to be protected from their own par-

ents." *Id.* Therefore, the right to familial integrity does not include a parent's right to remain free from child abuse investigations. *Id.*

The substantive due process component of the Due Process Clause of the Fourteenth Amendment "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir.2000) (internal quotations and citations omitted). The Supreme Court has emphasized that the touchstone of due process is the protection of the individual against the arbitrary action of government. *Lewis*, 523 U.S. at 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (internal quotations and citations omitted). Where abusive action of an executive rather than legislative action is alleged, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* at 846, 118 S.Ct. 1708.

■ In the instant case, viewing the facts in a light most favorable to the Plaintiffs, the caseworkers' investigation culminated with the statements "we understand your daughter Kelly was sexually molested three years ago and you didn't report it" and "we also understand that you were caught with another man and your husband committed suicide." The caseworkers also obtained interviews with each child and threatened to continue their investigation. In support of their contention, Plaintiffs cite *Croft*.

In *Croft*, the Westmoreland County Children and Youth Services ("CYS"), received a multiple hearsay report that a young child, still in diapers, was being sexually abused by her father. A CYS caseworker, accompanied by a state trooper, went to the plaintiffs' home, interviewed the parents, and based on rampant speculation regarding perceived inconsis-

tencies in the parents' response to the allegation of sexual abuse, the CYS caseworker gave the father an ultimatum: "Unless [the father] left his home and separated himself from his daughter until the investigation was complete, [the CYS caseworker] would take [the daughter] physically from the home that night and place her in foster care." *Croft,* 103 F.3d at 1124. At the conclusion of this interview, the CYS caseworker was uncertain whether any sexual abuse had occurred, but since she could not rule it out, and the parents had not proved beyond any certainty there was no sexual abuse, the CYS caseworker determined she needed to remove the child or the source of the alleged abuse from the home. The parents acquiesced to the ultimatum and the district court subsequently entered summary judgment against the parents' complaint which alleged impermissible interference with their Fourteenth Amendment liberty interest in the continued companionship of their daughter. The Court of Appeals for the Third Circuit reversed. The court focused on "whether the information available to the defendants at the time would have created an objectively reasonable suspicion of abuse justifying the degree of inference with the parents' rights as the child's parents." *Id.* In the absence of such reasonable grounds, the governmental intrusions of this nature "are arbitrary abuses of power." *Id.*

*Croft* was explained and followed in *Miller v. City of Philadelphia,* 174 F.3d 368 (3d Cir.1999). *Miller* involved claims for the deprivation of substantive and procedural due process by a mother and her three children, *inter alia,* against the City of Philadelphia and its Department of Human Services ("DHS"), for removing the

children from the family home without probable cause and, in fact, based upon false information provided to the emergency judge who ordered the children removed temporarily.

The *Miller* court, explained that "[t]o generate liability, executive action must be so ill-conceived or malicious that it 'shocks the conscience.'" *Miller,* at 174 F.3d at 375 (quoting *Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). *Miller* also held that "[t]he exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." *Id.* The court concluded:

> We recognize that a social worker acting to separate parent and child does not usually act in the hyperpressurized environment of a prison riot or a high-speed chase. However, he or she rarely will have the luxury of proceeding in a deliberate fashion ... [a]s a result, in order for liability to attach, a social worker need not have acted with the purpose to cause harm, but the standard of culpability for substantive due process purposes must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'

*Id.* at 375–376 (internal quotations omitted); *Brown v. Commonwealth of Pennsylvania Dept. of Health,* 318 F.3d 473 (3d Cir.2003) (holding that the "shocks the conscience" standard apply in all cases where social workers are acting with urgency to protect a child). Although the court discussed and identified facts which indicated defendants' investigation was less professional than it should have been,[8]

---

8. Specifically, the court noted that: (1) the investigator had asked the children leading questions when he first visited their daycare center; (2) he requested that the mother produce all three children for examination at the hospital even though there were grounds to suspect only one of the children might have been abused; (3) he met secretly with the

the court concluded that, "even if all of the facts alleged above were true, [the DHS investigator] did not act in a way that shocks the conscience." *Id.* at 377.

Under the instant circumstances, and comparing them with the facts and circumstances of *Croft* and *Miller,* the caseworkers' conduct, as a matter of law, does not rise to a level of arbitrary conduct as in *Croft,* where the social worker demanded that a parent leave the home until the investigation was complete or she would remove the child and place her in foster care. More importantly the caseworkers' conduct while certainly not condonable, does not rise to the level of a constitutional violation, and does not even approach the inappropriate behavior of the caseworker in *Miller* where the caseworker had three children temporarily removed from the home based on false information provided to a judge.

While the poor judgment of Acevedo and Pellot is disturbing, their comments, which include such things as, "we also understand that you were caught with another man and your husband committed suicide," even when compounded with the threat to continue the investigation, can hardly be equated with the arbitrary threat to remove the child in *Croft* or the actual removal of the children from the home in *Miller,* where no constitutional violation was found. *See also Rinderer v. Delaware County Children and Youth Services,* 703 F.Supp. 358, (E.D.Pa.1987) (holding that no cause of action exists under section 1983 where parent was not separated from children). Thus, a reasonable jury could not conclude, on the undisputed facts, that

the caseworkers' conduct "shocks the conscience." Defendant, therefore, is entitled to qualified immunity on this violation of familial integrity claim because there is no constitutional violation of Plaintiffs' right to familial integrity.

### B.

■ Count IV of the Complaint alleges that Plaintiffs' fundamental right to Equal Protection was violated by Defendants during the course of the investigation.[9] Plaintiffs state, that: "But for the race of the plaintiffs thy [sic] would not have been treated in the manner in which they were treated." (Pls.' Compl. ¶ 57). Plaintiffs argue in their response to Defendants' instant motion that "[Coleman's] indignation at being accused of child abuse was particularly unpalatable to the minority caseworkers because it was coming from a white woman." (Pls.' Br. in Opp. to Defs.' Mot. for Sum. Judg. at 25). Liability under section 42 U.S.C. § 1983 is premised on intentional discrimination. *See Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Conclusory allegations of racial bias do not establish discriminatory intent. *Flagg v. Control Data,* 806 F.Supp. 1218, 1223 (E.D.Pa.1992).

Here, Plaintiffs have presented nothing more than unclear, conclusory allegations that Plaintiffs' race played a role in the conduct of the caseworkers. In fact, Plaintiffs admit "[We] have no direct evidence set forth in [our] complaint or otherwise in the record to support this allegation." (Pls.' Br. in Opp. to Defs.' Mot. for Sum. Judg. at 25).

---

hospital social worker and excluded the mother's attorney from the area outside the examination room; and (4) he was advised by a doctor that it was not clear whether the child's bruises were accidental or a result of physical abuse.

**9.** Traditional equal protection standards require a showing that the system of enforcement had a "discriminatory effect" and was "motivated by a discriminatory purpose." *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985).

However, Plaintiffs ask this Court to ignore their failure to meet the burden of production. Instead, Plaintiffs relying solely on the public accommodations provision of the Civil Rights Act,[10] ask this Court to shift the burden to Defendants to articulate some legitimate, nondiscriminatory reason for its actions. Regardless of Plaintiffs' attempts to shift the burden of proof, Plaintiffs fail to produce any evidence of discrimination. Absent evidence of discrimination, this Court finds that Plaintiffs are unable to support their allegations of discrimination. Therefore, the Defendants are entitled to qualified immunity.

## C.

■ Plaintiffs' Complaint also alleges a violation of Plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures. It is well settled under the Fourth Amendment that a search conducted without a warrant issued upon probable cause is *per se* unreasonable, subject only to a few specifically established and well-delineated exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). It is equally well established that an exception to the warrant requirement is a search that is conducted pursuant to consent. *Id.* When the State attempts to justify a search on the basis of consent, the State must demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. *Id.* at 248, 93 S.Ct. 2041. "Voluntariness is a question of fact to be determined from all the circumstances." *Id.* at 248–49, 93 S.Ct. 2041.

In the instant case, Plaintiffs argue that consent was not voluntarily given to the caseworkers to enter the home. Plaintiffs emphasize that the caseworkers "did not ask for permission to examine portions of the premises," (Pls.' Br. in Opp. to Defs.' Mot. for Sum. Judg. at 17), and argue that consent was not given because Coleman did not specifically say "come on in." (Coleman Dep. at 13:2–3). However, according to Coleman's own statements, "After putting her dogs away, Elaine [Coleman] *invited* the [case]workers into the house."[11] (Pls.' Answer. to Interrogs. ¶ 14)(emphasis added). Plaintiffs do not argue, nor is there any evidence to indicate, that Coleman was incapable of giving consent or that Coleman was threatened or coerced in any way. Further, while at the front door, Coleman told the caseworkers to wait "one minute" while she put her dogs away. Coleman then put her dogs away, opened the door, and allowed the caseworkers to enter the home. (Coleman Dep. at 12:19–24). These actions are entirely consistent with Coleman's admission that she invited the caseworkers into her home. Considering the totality of the circumstances, this Court finds that consent to enter the home was freely given.

---

**10.** 42 U.S.C. § 2000a provides in relevant part: "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a (2002).

**11.** Coleman's subsequent attempt to cure her admission during deposition does not create a genuine question of fact sufficient for this claim to survive summary judgment.

Q. Okay. Did you let [the caseworkers] into your home?
A. Well, when I opened up the door the one woman, which one I don't know, they just—I didn't say come in. All I did was open up the door to talk to them and they just came in and I just kind of like moved out of the way and they showed me identification. (Coleman Dep. at 12:25–13:6).

■ Having found that consent to enter the home was freely given by Coleman, this Court will now examine whether the scope of the search exceeded the terms of the consent or if consent was revoked at any time. The Supreme Court has held that the standard for measuring consent is objective reasonableness. *See Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). The scope of consent is that which a typical reasonable person would understand from the exchange between the government and the person who gave the consent. *See id.*

Once inside the home the caseworkers told Coleman that they needed to see if she had food for her children. (Coleman Dep. at 14:4–6). Coleman showed the caseworkers the contents of her refrigerator and the contents of the kitchen. (Coleman Dep. at 16:10–16). Later, Coleman led the caseworkers to the basement floor of her house to show the caseworkers her additional refrigerators which held overstock. (Coleman Dep. at 18:21–24). Coleman did not recall if the caseworkers even asked to examine the basement. (Coleman Dep. at 19:17–18). Yet, when Coleman was questioned as to why she led the caseworkers into the basement, she stated, "[t]o prove to them that their allegations, they were wrong." (Coleman Dep. at 19:15–16). Considering the facts and all permissible inferences in favor of Plaintiffs, this Court finds that the examination of the kitchen and basement was conducted with Coleman's consent and were completely reasonable.

Next, this court will consider whether the caseworkers violated Coleman's Fourth Amendment rights by requesting that she submit to a drug test. It is well settled that the collection and analysis of a urine sample to test for drug use constitutes a search that is subject to the constraints of the Fourth Amendment. *See*

*Skinner v. Railway Executives' Assoc.,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). During the investigation, the caseworkers asked Coleman to complete a drug test. Initially Coleman agreed, but then refused and did not complete the test at the urging of her mother. Since Coleman did not give consent to the caseworkers to conduct a drug test, and because no drug test was conducted, there was no search.

■ This Court will next turn its attention to whether the interviews of the three children were unreasonable. While it is clear that the interview of a child implicates that child's Fourth Amendment interests, the Supreme Court in *New Jersey v. T.L.O.,* 469 U.S. 325, 337, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) noted that the underlying command of the Fourth Amendment is always that searches and seizures be reasonable. This reasonableness depends on the context within which a search takes place. The determination of the standard of reasonableness governing any specific class of searches requires balancing the need to search against the invasion that the search entails. On one side of the balance are arrayed the individual's legitimate expectations of privacy and personal security; on the other, the government's need for effective methods to deal with breaches of public order. *T.L.O.,* 469 U.S. at 337, 105 S.Ct. 733.

The character of the intrusion complained of in the instant case is the questioning by DYFS caseworkers of all three Murphy children. As to the state's interest in preventing child abuse, "there is no question." *Picarella v. Terrizzi,* 893 F.Supp. 1292, (M.D.Pa.1995); *see also Wyman v. James,* 400 U.S. 309, 318, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971) (public interest in the welfare of children: "There is no more worthy object of the public's concern").

Statutory authority for DYFS to investigate child abuse allegations appear in N.J.Stat.Ann. § 9:6–8.8 et. seq. (2002). The regulations adopted to implement the statutes require DYFS to evaluate the available information to determine whether an allegation is substantiated or not. *See* N.J.Admin.Code tit. 10, § 129a–3.3 (2002). During an investigation, the caseworker shall interview the child who is the subject of the investigation and any other child who resides in the same home. *See* N.J.Admin.Code tit. 10, § 129a–2.3 (2002).

According to Plaintiffs, the caseworkers informed Coleman of the need to interview each of her children. After completing private interviews with Lisa Rose and Stacy, the caseworkers told Coleman that they needed to interview Kelly. Coleman's father thereby retrieved Kelly from a nearby house and brought her home. Plaintiffs allege, without elaborating, that the interviews were unreasonable because they were conducted without the "requisite consent." [12] (Pls.' Br. in Opp. to Defs.' Mot. for Sum. Judg. at 17). The record indicates that at only one point was there an objection to the caseworkers' interviews. (Coleman Dep. at 29:1–13). It was upon this objection that the interviews ceased. This Court does not agree that questioning of children regarding alleged abuse is unreasonable in light of the state's interest in uncovering child abuse. Indeed, such interviews are required by state law and are not out of the ordinary. Therefore, we find that the interviews of Lisa Rose, Stacy, and Kelly were, under the circumstances, conducted reasonably. Since no Fourth Amendment right was violated during any of the events described

above, Defendants must be granted immunity.

**D.**

■ Finally, Defendants move for summary judgment on all claims against DYFS, and Acevedo and Pellot in their official capacities on the grounds that such suits are barred because Defendants in their official capacities are not "persons" who can be sued under 42 U.S.C. § 1983.

Section 1983 creates liability for any "person" who under color of state law, deprives another person of a constitutional right. *See* 42 U.S.C. § 1983. In *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Supreme Court considered whether a State is a "person" that can be sued under this section. The Court could not have been clearer in its holding that "neither a State nor its officials acting in their official capacities are 'persons' under section 1983". *Id.* at 71, 109 S.Ct. 2304. This conclusion was based on both the Eleventh Amendment and on the Court's statutory interpretation of Section 1983 itself.

Thus, this Court concludes that Plaintiffs' section 1983 claims against DYFS, as a state agency, and Acevedo and Pellot in their official capacities, cannot be sustained. *See Simmerman v. Corino*, 804 F.Supp. 644 (D.N.J.1992) (holding that DYFS is a state agency immune from section 1983 claims) (Irenas, J.). Therefore, Defendants' motion to dismiss the section 1983 claims against DYFS, and Acevedo and Pellot in their official capacities, will be granted. Furthermore, as shown above, Plaintiffs have failed to establish any cognizable federal claims against DYFS or

---

**12.** This assertion may be tenable if no probable cause existed. However, Plaintiffs have made no attempt to argue this point in their Brief In Opposition to Defendants Motion for Summary Judgment. Additionally, such an assertion could not be supported factually, as Plaintiffs have made no attempt to request, from DYFS, information regarding the genesis of the investigation.

either of the named defendants in their individual capacity. Accordingly, Plaintiffs' claim for attorney's fees under 42 U.S.C. § 1988, which allows a prevailing party in a 42 U.S.C. § 1983 action to recover reasonable attorney's fees is denied. *See* 42 U.S.C. § 1988 (2002).

## IV.

Plaintiffs also allege state law claims for intentional infliction of emotional distress (Count III), discrimination in violation of the New Jersey Constitution and the New Jersey Law Against Discrimination (Count IV), and seek injunctive relief against DYFS requiring the destruction of records (Count II). Once a federal court has dismissed all claims over which it has original jurisdiction, it should ordinarily decline to exercise supplemental jurisdiction over state law claims. *See United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *see also Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 195–96 (3d Cir.1976); *Foster v. Township of Hillside,* 780 F.Supp. 1026, 1047 (D.N.J.1992). Since no federal issues remain, we will dismiss Plaintiffs' state law claims without prejudice.

## V.

For the reasons set forth above, Defendants' Motion for Summary Judgment is granted. The Court will issue an appropriate order.