**Kara GEDRICH, a minor by her next friend, et al., Plaintiffs,**

v.

**FAIRFAX COUNTY DEPARTMENT OF FAMILY SERVICES, et al., Defendants.**

**No. CIV.A. 02–1708–A.**

United States District Court,
E.D. Virginia.
Alexandria Division.

Sept. 12, 2003.

Pro se, for Plaintiffs/Movants.

Patricia Payne, Payne & Associates, Washington, D.C., Jacqueline May Reiner, Wright Robinson Osthimer & Tatum, Richmond, VA, James Edward Wilcox, Jr., Office of the County Attorney, Thomas M. Wochok, Hamilton Altman Canale & Dillon LLC, Fairfax, VA, for Defendants/Respondents.

### MEMORANDUM OPINION

ELLIS, District Judge.

In this action, plaintiffs, a mother, daughter and stepfather, assert federal statutory and state law claims against eighteen defendants based on allegations that the mother and stepfather were separated from the daughter for a period of approximately three months owing to defendants' false allegations of sexual abuse against plaintiff stepfather. Threshold dismissal motions by all defendants and defendants Alternative House, El–Sayed, and Raphael's motion for summary judgment in the alternative raise a variety of dispositive issues, which are addressed here.

## I.

Plaintiffs Darlene Gedrich–Lenz ("Gedrich–Lenz"), Enrique Lenz ("Lenz"), and Kara Gedrich ("Kara") are respectively mother, stepfather, and daughter and are citizens of the Commonwealth of Virginia. The eighteen defendants are:

(1) Fairfax County Board of Supervisors ("Fairfax County");

(2) Dana Paige ("Paige"), director of the Department of Family Services ("DFS");

(3) Carolyn Fowler ("Fowler"), program manager of the Foster Care Division at DFS;

(4) Elizabeth Spell ("Spell"), a supervisor in Child Protective Services ("CPS") at DFS;

(5) Patricia Sullivan ("Sullivan"), a supervisor in the Foster Care Division at DFS;

(6) Ann Bussells ("Bussells"), a caseworker for CPS at DFS;

(7) Lilly Reed–Hall ("Reed–Hall"), a caseworker for Foster Care at DFS;

(8) John Harrold ("Harrold"), director of Woodburn Mental Health Center ("Woodburn")

(9) Teresita DiPinto, M.D. ("DiPinto"), a physician at Woodburn;

(10) Alternative House, The Abused and Homeless Children's Refuge ("Alternative House");

(11) Samir El–Sayed, director of Alternative House;

(12) Elana Raphael, a counselor at Alternative House;

(13) Adolescent and Family Growth Center ("AFGC")

(14) Roma Farge, director of admissions and foster care at AFGC;

(15) Piedmont Behavioral Health Center ("Piedmont");

(16) Michael Beavers, Chief Executive Officer of Piedmont;

(17) Stacy Stickley, a therapist at Piedmont; and

(18) Wayne Villeneuve, a clinical director at Piedmont.

## II.[1]

On November 10, 2000, Kara, a troubled teen with a suspected substance abuse problem, ran away from home. For a period of eleven days, Kara stayed with various friends and was allegedly raped while staying at the home of one of these friends. On November 21, 2000, the mother of one of Kara's friends called CPS in the Department of Family Services regarding Kara. In the course of the call, Kara spoke with someone at CPS who asked her whether her stepfather, Enrique Lenz, had been "inappropriate" with her. Kara said she did not know and explained that "something bad had happened" to her. Defendant Bussells, a CPS caseworker, then began a joint investigation with the Fairfax County Police Department ("FCPD") to investigate possible sexual abuse.

On November 22, 2000, Bussells took Kara to Woodburn Mental Health Center

("Woodburn") for a psychological evaluation. Bussells then took Kara to Alternative House for placement. Gedrich–Lenz, signed the admissions form permitting her daughter to stay at Alternative House.[2] This form did not mention or refer to any "no-contact" policy or other restrictions that would preclude parental contact with Kara during her stay at Alternative House. While Bussells suggested to Gedrich Lenz that she and her husband refrain from initiating contact with Kara for a few days, no mention was made of any formal "no parental contact" restrictions. Indeed, on November 23, 2000, Gedrich–Lenz contacted Alternative House and spoke with Kara.

Later, on November 23, 2000, Kara made a request to attend Thanksgiving dinner with her family at her grandparents' home. An Alternative House employee called Bussells to inquire whether a familial outing might be approved for Kara, leaving a detailed message on Bussells' answering machine. Because Alternative House never received a return call from Bussells, Kara's request was denied.[3] On November 24, 2000, defendant Raphael, a counselor at Alternative House, spoke with Bussells on the phone, at which point Bussells reiterated that Kara should have no outings or telephone contact with her parents. Plaintiffs allege that for the next week, Gedrich–Lenz attempted to contact Kara numerous times, but was told by Alternative House that she could not have any contact with Kara.

On November 27, 2000, Gedrich–Lenz spoke with Bussells and demanded rescis-

---

1. The facts recited here are derived from plaintiffs' Third Amended Complaint. As required in the analysis of dismissal motions, these facts are assumed to be true for purposes of the motion. *See, e.g., Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir. 1993). Where facts outside the complaint are considered, the source of those facts is noted.

2. Defendants Alternative House and El–Sayed attached a copy of the admissions form signed by Gedrich–Lenz as Exhibit III to their Memorandum in Support of Motion to Dismiss.

3. This information is from the Alternative House records attached as Exhibit 6 to Plaintiffs' Memoranda in Opposition to Alternative House and El–Sayed's Motion to Dismiss.

sion of the "no parental contact" restriction preventing her from speaking with Kara. Bussells denied Gedrich–Lenz's request and asked for her continued patience on the matter. The following day, November 28, Alternative House staff again refused to allow Gedrich–Lenz to speak with Kara, despite acknowledging that Gedrich–Lenz retained legal custody of Kara. On this occasion, Alternative House staff informed Gedrich–Lenz that Alternative House had a "corroborating policy" under which Alternative House could not override CPS restrictions, even when parents retained legal custody of the child at issue.

On November 28, 2000, Lenz voluntarily met with Detective John Comiskey of the FCPD and was informed of the sexual abuse allegations against him and the pending joint investigation. Detective Comiskey questioned Lenz about a specific incident during which Lenz saw Kara undressed and inquired about massages Lenz had given Kara, as well as internet access Kara had to Lenz's laptop computer. Lenz denied any inappropriate behavior or intentions on his part with regard to Kara, particularly with respect to the specific incidents mentioned by Detective Comiskey. After the interview, Detective Comiskey informed Lenz that criminal charges would not be pursued.

According to Alternative House, Kara was scheduled to leave the facility on December 5, 2000, but Gedrich–Lenz made an oral request to extend Kara's stay there until December 8, 2000, which request was granted by Alternative House. On December 7, 2000, Gedrich–Lenz made arrangements to discharge Kara from Alternative House the following day after a scheduled meeting with Bussells. During this meeting on December 8, 2000, Bussells admitted to Gedrich–Lenz that she had put in place the "no parental contact" restriction at Alternative House.

After the meeting, Bussells and her supervisor, Spell, pursuant to Virginia law,[4] took emergency custody of Kara, and Bussells orally requested that Kara remain at Alternative House until December 11, 2000. Alternative House complied with this request. Thereafter, within the time prescribed by Virginia law,[5] Bussells sought and was granted an emergency removal order for Kara in Fairfax County Juvenile and Domestic Relations ("J & DR") Court on December 11, 2000. Plaintiffs claim that Bussells, in seeking the emergency removal order, made false statements to the J & DR Court and submitted an affidavit that was "intentionally erroneous, deceptive, and misrepresented and omitted crucial facts." In granting the emergency order, the J & DR Court scheduled a hearing on December 14, 2000 to review the matter. In the interim, Kara was placed at This Way House on December 11, 2000 with Bussells' order that Kara have no contact with her parents.

The December 14 hearing never occurred; it was obviated by the JD & R Court's entry of an order, agreed to by Gedrich–Lenz and DFS, continuing DFS's custody of Kara.[6] In this order, Gedrich–

---

**4.** Va.Code § 63.2–1517 (providing that a child-protective services worker investigating a report or complaint of abuse and neglect has the power to take a child into custody for up to 72 hours without the prior approval of her parents whenever there is imminent danger to the child's life or health to the extent that severe or irremediable injury will otherwise likely result, and no later than 72 hours after taking the child into custody, the worker must obtain an emergency order).

**5.** *See id.* (providing 72–hour time period within which CPS worker must obtain an emergency order).

**6.** On December 13, 2000, Lenz and Gedrich–Lenz were served with a Petition for Abuse and Neglect for Kara and preliminary protective orders for their other three children. As

Lenz stipulated to a finding that Kara was a "child in need of services," as defined by Va.Code § 16.1–228.[7] The order was silent on the issue of parental contact or visitation.

On December 15, 2000, Reed–Hall, a foster care worker at DFS, transferred Kara to a foster care home. Arrangements for the foster placement were made by AFGC. Reed–Hall and Farge, the director of AFGC, restricted Kara's contact with her family while at the foster care home. Thereafter, on December 18, 2000, Reed–Hall contacted Harrold, a director at Woodburn, to request an emergency "Certification of Need for Admission to Residential Psychiatric Treatment" for Kara. Acting on this request, Harrold arranged for Dr. Teresita DiPinto, a psychiatrist at Woodburn, to meet with Kara. The meeting occurred and DiPinto issued the requested certificate for admission to a 24–hour secured residential facility. Plaintiffs allege that DiPinto met with Kara for only five minutes before issuing the requested certificate. Plaintiffs further contend that DiPinto falsely documented Kara's treatment history in the issuance of this certificate. Pursuant to the certificate, Reed–Hall transferred Kara on December 19, 2000 to Piedmont, a 24–hour secure and locked facility. The Piedmont staff who handled Kara's case were Stacy Stickley, Wayne Villeneuve, and Michael Beavers.

Gedrich–Lenz made repeated efforts to contact Kara at Piedmont, but all such efforts were rebuffed by Reed–Hall and the Piedmont staff.

On December 20, 2000, Gedrich–Lenz and Lenz returned to J & DR Court to address the bar against parental contact and visitation. The J & DR Court ordered visitation between Gedrich–Lenz and Kara to the maximum extent at the discretion of DFS. Thereafter, Piedmont kept the "no parental contact" restriction in place for clinical reasons, although Kara's grandfather was permitted to call Kara on a daily basis and to visit her three times a week for the duration of her placement at Piedmont. On January 4, 2001, Gedrich–Lenz and Lenz unsuccessfully petitioned the J & DR Court to vacate the December 14, 2000 consent order; that court concluded they had not established good cause to vacate the order.

On January 8, 2001, Bussells and Spell informed Lenz of the completion of their abuse investigation and their conclusion that there were grounds to believe Lenz had sexually abused Kara. Throughout January and February 2001, Gedrich–Lenz made numerous attempts to communicate with the Piedmont staff, Reed–Hall, and others at DFS regarding visitation with Kara and the status of their case, all to no avail. On February 21, 2001, a final dispo-

---

part of the December 14, 2000 agreed order, the Petition for Abuse and Neglect for Kara was amended to a Child in Need of Services ("CHINS") petition and the preliminary protective orders for the other three children were dismissed.

7. "Child in need of services" means (i) a child whose behavior, conduct or condition presents or results in a serious threat to the well-being and physical safety of a child or (ii) a child under the age of 14 whose behavior, conduct or condition presents or results in a serious threat to the well-being and physical safety of another person; how-

ever, no child who in good faith is under treatment solely by spiritual means through prayer in accordance with the tenets and practices of a recognized church or religious denomination shall for that reason alone be considered to be a child in need of services, nor shall any child who habitually remains away from or habitually deserts or abandons his family as a result of what the court or the local child protective services unit determines to be incidents of physical, emotional or sexual abuse in the home be considered a child in need of services for that reason alone.
Va.Code § 16.1–228.

sition hearing was held in which the J & DR Court terminated DFS and Piedmont's involvement in the case and transferred custody of Kara to her maternal grandfather. The following month the J & DR Court returned custody of Kara back to Gedrich–Lenz and Lenz.

### III.

On March 21, 2003, plaintiffs filed their Second Amended Complaint. An Order, dated May 9, 2003,

(1) granted defendants Department of Family Services, Community Service Board ("CSB"), Community Policy Management Team ("CPMT"), and Woodburn's motion to dismiss based on these entities' lack of capacity to be sued;

(2) granted defendants Stickley, Villeneuve, Band, Beavers, El–Sayed and Raphael, Piedmont and Alternative House's motions to dismiss based on defective service of process;

(3) granted defendant Scott's motion to dismiss, based on absolute immunity;

(4) granted defendant Bussells motion to dismiss insofar as the plaintiffs' first amended complaint purports to state a claim arising from Bussells' conduct in preparing and filing the removal petition, but denied the motion insofar as plaintiffs' first amended complaint purports to state a claim against Bussells based on any other conduct.

(5) granted defendants Alexander, Scott, and CPMT's motion to dismiss based on the statute of limitations.

(6) granted defendants DFS, Paige, Fowler, Alexander, Spell, Sullivan, Iddings, Bussells, Reed–Hall, Scott, CSB, CPMT, Woodburn, Harrold, and DiPinto's motion to dismiss Count VI (Adoption Assistance and Child Welfare Act).

Further, plaintiffs were permitted to file a Third Amended Complaint, which they did on May 20, 2003. It alleges the following claims in eleven counts:

Count I alleges a violation of 42 U.S.C. §§ 1983 and 1985 based on plaintiffs' Fourteenth Amendment Substantive Due Process right to familial relations, integrity, privacy, and association against Fairfax County, Bussells, Spell, Reed–Hall, Sullivan, Fowler, DiPinto, Alternative House, El–Sayed, Raphael, AFGC, Farge, Piedmont, Beavers, Stickley, and Villeneuve.

Count II alleges a violation of 42 U.S.C. §§ 1983 and 1985, based on plaintiffs' Fourteenth Amendment Procedural Due Process rights against Fairfax County, Bussells, Spell, Alternative House, El–Sayed, Raphael, Reed–Hall, Sullivan, Fowler, DiPinto, AFGC, Farge, Piedmont, Beavers, Stickley, and Villeneuve.

Count III alleges a violation of 42 U.S.C. §§ 1983 and 1985, based on plaintiffs' First and Ninth Amendment rights against Fairfax County, Bussells, Reed–Hall, Sullivan, Piedmont, Beavers, Stickley, and Villeneuve.

Count IV alleges a violation of 42 U.S.C. §§ 1983 and 1985, based on plaintiffs' Fourth Amendment rights against Fairfax County, Bussells, Spell, Alternative House, El–Sayed, Raphael, Reed–Hall, Sullivan, Harrold, DiPinto, AFGC, Farge, Piedmont, Beavers, Stickley, and Villeneuve.

Count V alleges a violation of the Rehabilitation Act and 42 U.S.C. § 1983 against Fairfax County, AFGC, and Piedmont.

Count VI alleges supervisory liability against Fairfax County, Paige, Fowler, Sullivan, Spell, and Harrold.

Count VII alleges municipal liability against Fairfax County, Paige, Spell, Fowler, Sullivan, and Harrold.

Count VIII alleges intentional infliction of emotional distress against Fairfax County, Paige, Spell, Bussells, Fowler,

Sullivan, Reed–Hall, Harrold, DiPinto, Alternative House, El–Sayed, Raphael, AFGC, Farge, Piedmont, Beavers, Stickley, and Villeneuve.

Count IX alleges gross negligence against Fairfax County, Paige, Spell, Bussells, Fowler, Sullivan, Reed–Hall, Harrold, DiPinto, Alternative House, El–Sayed, Raphael, AFGC, Farge, Piedmont, Beavers, Stickley, and Villeneuve.

Count X alleges malicious prosecution against Fairfax County, Bussells, Spell, and Reed–Hall.

Count XI alleges malpractice against Fairfax County, Bussells, Reed–Hall, DiPinto, Alternative House, El–Sayed, Raphael, AFGC, Farge, Piedmont, Stickley, Villeneuve, Sullivan, and Beavers.

Plaintiffs sue Paige, Fowler, Spell, Sullivan, Bussells, and Reed–Hall in both their official and individual capacities. Harrold, DiPinto, El–Sayed, Raphael, Farge, Beavers, Stickley, and Villeneuve are sued in their individual capacities.

## IV.

### A. Statute of Limitations for Fairfax County Claims

Fairfax County filed a motion to dismiss all claims against it pursuant to Rule 12(b)(6), Fed.R.Civ.P., arguing that the Third Amended Complaint is time-barred. The facts pertinent to this motion are undisputed and may be succinctly summarized.

Plaintiffs filed their initial complaint on November 20, 2002. This complaint did not name Fairfax County as a defendant and was not served on any of the named defendants. Plaintiffs' First Amended Complaint, filed on March 21, 2003, included "Fairfax County" in the caption, but this reference was stricken through and initialed by Gedrich–Lenz. Left untouched was a reference to the County as a defendant in Paragraph 15 of the First Amended Complaint. Service of the First Amended Complaint, including service on the named Fairfax County employees and DFS, occurred on March 31, 2003. The First Amended Complaint was never served on Fairfax County. Thereafter, on May 20, 2003, pursuant to an order permitting the filing of a further amended complaint, plaintiffs filed their Third Amended Complaint. This complaint, for the first time, named the Fairfax County Board of Supervisors as a defendant. The Third Amended Complaint seeks recovery for injuries occurring from November 2000 through February 21, 2001.

▮▮▮ Analysis of this issue properly begins with recognition that section 1983 does not contain a statute of limitations, but instead borrows the appropriate limitations period from state law. *See McCausland v. Mason County Bd. of Educ.*, 649 F.2d 278, 279 (4th Cir.1981) ("For the most part, the Reconstruction Civil Rights Acts do not provide specifically for limitations on the time in which claims thereunder may be brought. The federal courts therefore borrow an appropriate limitations period from the state in which the claims arose."). In Virginia, the statute of limitations for personal actions for injury to person or property is two years, accruing from the date the injury is sustained. *See* Va.Code §§ 8.01–243, 8.01–230. All the incidents alleged in the complaint involving the county defendants occurred prior to February 21, 2001. As a result, the statute of limitations for claims against Fairfax County expired on February 21, 2003. Given this, and because the Third Amended Complaint, which added the Fairfax County Board of Supervisors as a party defendant, was not filed until May 20, 2003, long after the two year statute of limitations had expired, plaintiffs' claims against Fairfax County are time-barred unless the claims in the Third Amended Complaint relate back to the initial complaint pursuant to Rule 15(c), Fed.R.Civ.P.

Rule 15(c) prescribes certain requirements for the relation back of a claim in an amended complaint. The first requirement is that the claim in the amended pleading must arise out of the same transaction or occurrence as the original claim. Fed.R.Civ.P. 15(c)(2). This requirement is plainly satisfied here, as both the original complaint and the Third Amended Complaint set forth virtually identical facts. In the case of an amendment that changes the party or the naming of a party, Rule 15(c) imposes further requirements. It requires (i) that the party brought in by amendment must have received notice of the claim "within the period provided by Rule 4(m) for service of the summons and complaint," (ii) that the party not be prejudiced in maintaining a defense on the merits, and (iii) that the party "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." Fed.R.Civ.P. 15(c)(3).

Rule 4(m) requires service of the summons and complaint within 120 days of the filing of the complaint, except that where a plaintiff shows good cause for the failure to meet the 120–day limit, "the court shall extend the time for service for an appropriate period." Fed.R.Civ.P. 4(m). The Advisory Committee Notes to the 1991 Amendment of Rule 15(c) clarify that "[i]n allowing a name-correcting amendment within the time allowed by Rule 4(m), this rule allows not only the 120 days specified in that rule, but also any additional time resulting from any extension ordered by a court pursuant to the rule." Thus, courts have allowed relation back provided the

added party had notice within 120 days following the filing of the complaint, or later if good cause is shown. *See, e.g., Skoczylas v. Fed. Bureau of Prisons*, 961 F.2d 543, 545 (5th Cir.1992) ("[R]elation back is allowed as long as the added party had notice within 120 days following the filing of the complaint, or longer if good cause is shown."); *Heiser v. Ass'n of Apartment Owners of Polo Beach Club*, 848 F.Supp. 1482, 1487 (D.Hawai'i 1993) (finding good cause for plaintiffs' failure to serve their amended complaint within 120 days).

The application of these principles to the facts at bar leads to the conclusion that plaintiffs' claims against Fairfax County are not time barred. To begin with, the First Amended Complaint named several Fairfax County employees in their official capacities, which has the same effect as naming Fairfax County itself. *See Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (holding that suing local government officials in their official capacity is "only another way of pleading an action against an entity of which an officer is an agent"). Thus, Fairfax County first had notice of plaintiffs' suit on March 31, 2003—131 days after the original complaint was filed and thus eleven days beyond the 120 day period prescribed in Rule 4(m). This is not fatal to the plaintiffs' claims, for there is ample good cause to excuse this brief delay given (i) that it does not appear that this delay was caused by plaintiffs' lack of diligence, (ii) the absence of any prejudice to Fairfax County, and (iii) the fact that plaintiffs are proceeding *pro se*,[8] particularly since Fair-

---

**8.** *See Donald v. Cook County Sheriff's Dep't*, 95 F.3d 548, 557 (7th Cir.1996) (allowing relation back because *pro se* plaintiff's failure to identify and serve defendants within 120 days "was not due to any lack of diligence on his part"); *id.* at 555 (noting that "it is incum-

bent on [the Court] to take appropriate measures to permit the adjudication of *pro se* claims on the merits, rather than to order their dismissal on technical grounds"); *accord Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (holding *pro*

fax County received effective notice of plaintiffs' claims at the same time as all other named defendants. Thus, Fairfax County's motion to dismiss the complaint as time-barred must be denied.

*B. Section 1985 Claims*

▬▬ In counts one through seven of their Third Amended Complaint, plaintiffs allege conspiracy claims against all defendants under 42 U.S.C. § 1985. While plaintiffs fail to specify the subsection of § 1985 on which they rely, it is clear that only § 1985(3) has any possible relevance to this case.[9] To state a claim under § 1985(3), there must be "some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). The Third Amended Complaint is devoid of any allegations of class-based discriminatory animus; therefore all § 1985 claims against all defendants must be dismissed.

*C. Substantive Due Process (Count I)*

To establish a claim under § 1983, a plaintiff must prove (1) that the defendant has deprived him of a right secured by the "Constitution and laws of the United States" and (2) that the defendant deprived him of this constitutional right "under color of any statute, ordinance, regulation, custom, or usage of any State or territory." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Plaintiffs make three allegations in their substantive due process claim. First, plaintiffs allege that Fairfax County, Bussells, Spell, Reed–Hall, Sullivan, Fowler, DiPinto, Alternative House,

El–Sayed, Raphael, AFGC, Farge, Piedmont, Beavers, and Stickley separated Kara from her family and denied her contact with her parents and siblings in violation of plaintiffs' right to familial relations. ¶ 221, Third Amended Compl. Second, plaintiffs claim that Fairfax County, Bussells, Reed–Hall, AFGC, Farge, Piedmont, and Stickley "routinely verbally assaulted, harassed, and unlawfully confined [Kara]" in violation of her "right to be protected from government created dangers and harm." ¶ 222. Finally, plaintiffs allege that Fairfax County, Reed–Hall, Sullivan, Fowler, DiPinto, AFGC, Farge, Piedmont, Beavers, Stickley, and Villeneuve deprived and conspired to deprive Kara from being placed "in the least restrictive environment while under the custody and care of the Defendants" and "routinely executed widespread practices contrary to statutory procedural safeguards and routinely denied and retaliated against [Kara] for her attempts to initiate and exercise lawful procedural safeguards afforded to patients to remedy [her] unlawful confinement." ¶ 223.

▬▬ The Fourteenth Amendment provides in relevant part that "[n]o state shall ... deprive any person of life liberty or property without due process of law." U.S. Const. amend. XIV. "The substantive component of the Due Process Clause 'bar[s] certain government actions regardless of the fairness of the procedures used to implement them.'" *Weller v. Dep't of Social Servs.,* 901 F.2d 387, 391 (4th Cir. 1990) (internal citation omitted). Thus, "[t]he touchstone of due process is the protection of the individual against arbitrary action of government." *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Generally, an

---

*se* complaint to "less stringent standards than formal pleadings drafted by lawyers").

9. Section 1985(3) addresses conspiracies to interfere with civil rights depriving persons of

rights or privileges, while §§ 1985(1) and (2) relate respectively to preventing an officer from performing his duties and obstructing justice. No facts alleged in the Third Amended complaint concern these two areas.

act must "shock the conscience" in order to constitute a violation of substantive due process. *See Weller,* 901 F.2d at 391. For purposes of clarity, plaintiffs substantive due process claim is divided by group of defendants.

### 1. *Fairfax County and County Employees*

 Plaintiffs allege that Fairfax County[10] and its employees Bussells, Spell, Reed–Hall, Sullivan, Fowler, and Di-Pinto violated their Fourteenth Amendment substantive due process right to "familia[l] relations, integrity, privacy, and association." ¶ 220, Third Amended Compl. The starting point in the analysis is the right to familial privacy. The Supreme Court has long recognized that parents have a liberty interest in familial relations as a component of substantive due process. *See Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Brokaw v. Mercer County,* 235 F.3d 1000, 1018 (7th Cir.2000) (citing *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944)). There is "a fundamental liberty interest of natural parents in the care, custody, and management of their child." *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). This interest, however, is not absolute; it "is limited by the compelling government interest in the protection of children—particularly where the children need to be protected from their own parents." *Croft v. Westmoreland County Children & Youth Servs.,* 103 F.3d 1123, 1125 (3d Cir.1997).[11] The Fourth Circuit

has limited the concept of familial privacy to two areas: "(1) thwarting governmental attempts to interfere with particularly intimate family decisions, and (2) voiding government actions that sever, alter, or otherwise affect the parent/child relationship." *Hodge v. Jones,* 31 F.3d 157, 163 (4th Cir.1994). It is this second aspect of familial privacy that is most relevant to the analysis presented here.

### (a) *Bussells and Spell*

 When conduct of a member of the executive branch is at issue, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Miller v. City of Philadelphia,* 174 F.3d 368, 375 (3d Cir.1999) (internal quotation marks omitted). To impose liability, "executive action must be so ill-conceived or malicious that it 'shocks the conscience;'" mere negligence is insufficient. *Id.* Although the "shocks the conscience" standard can be difficult to apply, clear guideposts do exist. In the area of child protection, "remov[al][of] a child in emergency action from the custody of a parent suspected of abusing him, *based upon some evidence of child abuse*" does not shock the conscience. *Weller v. Dep't of Soc. Servs.,* 901 F.2d 387, 391 (4th Cir. 1990) (emphasis added). Therefore, in assessing whether plaintiffs' state a substantive due process claim for Bussells and Spell's conduct in taking emergency custody of Kara on December 8, 2000, the determinative inquiry is whether these individuals had some evidence of sexual abuse on which to base their action.[12]

---

**10.** Fairfax County's potential liability for all of plaintiffs' constitutional allegations is addressed in the discussion of municipal liability. *See infra* pp. 471–73.

**11.** Furthermore, the precise confines of the right to familial privacy are nebulous. *See Hodge v. Jones,* 31 F.3d 157, 164 (4th Cir. 1994) ("There is little, if any, clear guidance in the relevant caselaw that would permit us

to chart with certainty the amorphous boundaries between the Scylla of familial privacy and the Charybdis of legitimate government interests.").

**12.** *See Croft,* 103 F.3d at 1126 ("Our focus here is whether the information available to the defendants at the time would have created an objectively reasonable suspicion of abuse justifying the degree of interference with the

Plaintiffs allege that Bussells and Spell took emergency custody of Kara without a shred of evidence to support their belief that Kara suffered sexual abuse at the hands of her stepfather, and further that Bussells and Spell knew Lenz never sexually abused Kara. Assuming plaintiffs' allegations are true, such knowing and intentional conduct by Bussells and Spell would satisfy the shocks-the-conscience standard. While there are cases where a caseworker is justified in taking emergency custody of a child, even where later investigation proves no abuse occurred, "a state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused, or is in imminent danger of abuse." *Croft,* 103 F.3d at 1126; *accord Brokaw v. Mercer County,* 235 F.3d 1000, 1019 (7th Cir.2000). While it is undisputed, as defendants point out, that Kara ran away from home, was expelled from school, and had a history of alcohol and drug use, these facts alone are insufficient to constitute "definite and articulable evidence" giving rise to a reasonable suspicion of sexual abuse by Lenz. *Brokaw,* 235 F.3d at 1019. Plaintiffs allege that Bussells and Spell had no evidence warranting a reasonable suspicion of sexual abuse by Lenz, and although defendants deny this allegation, it must be taken as true for purposes of resolving this threshold dismissal motion.[13] It follows, then, that plaintiffs state a Fourteenth Amendment substantive due process claim against Bussells and Spell for taking emergency custody of Kara, without any evidence

dence giving rise to a reasonable suspicion of sexual abuse by Lenz. *See Miller,* 174 F.3d at 375–76 ("[I]n order for liability to attach, a social worker need not have acted with the 'purpose to cause harm,' but the standard of culpability for substantive due process purposes must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.' ").[14]

The threshold dismissal inquiry does not end here, however, as both Bussells and Spell are government employees and thus may be entitled to absolute or qualified immunity. Absolute immunity exempts government officials from liability for " 'activities intimately associated with the judicial process'—i.e. activities that constitute the functional equivalent of those engaged in by judges, advocates, and witnesses." *Vosburg v. Dep't of Soc. Servs.,* 884 F.2d 133, 136 (4th Cir.1989). Insofar as plaintiffs' substantive due process claim encompasses Bussells' conduct in the actual preparation and filing of the emergency removal petition in the J & DR Court on December 11, 2000, including her attachment of an affidavit to the petition alleging that Kara was an abused and/or neglected child, Bussells is entitled to absolute immunity. *See id.* at 135 (granting absolute immunity from suit under § 1983 to social workers with respect to their conduct in preparing and filing a removal petition and analogizing such conduct to that of prosecutors initiating and pursuing a criminal prosecution). Moreover, because Virginia law permits the emergency removal of a child without prior judicial

[plaintiffs'] rights as . . . parents. Absent such reasonable grounds, governmental intrusions of this type are arbitrary abuses of power.") (footnote omitted).

13. *See supra* note 1.

14. Of course, it may ultimately be determined on a more complete record that there was

articulable evidence giving rise at the time to a reasonable suspicion of sexual abuse by Lenz, in which case plaintiffs' claim in this regard would fail. And this would be true even if later investigation showed no abuse. *See Croft,* 103 F.3d at 1126.

authorization provided an order is obtained within 72 hours,[15] Bussells and Spell are also absolutely immune from suit for their decision to seek emergency removal of Kara on December 8, 2000, as this constituted the initial step triggering the judicial proceedings that followed three days later. In taking this step, Bussells and Spell were acting in a prosecutorial, rather than an investigative, capacity. *See Vosburg,* 884 F.2d at 135 (affording social workers absolute immunity in filing a removal petition because they were "acting in a prosecutorial, rather than an investigative or 'policing' capacity").

 Social workers, however, are not entitled to absolute immunity for their conduct in investigating the possibility that a removal petition should be filed. *Id.* at 138. In this regard, plaintiffs allege that during Kara's stay at Alternative House from November 22, 2000 until December 8, 2000, while Bussells' abuse investigation was ongoing, Bussells instructed Alternative House staff to restrict contact between Kara and her mother and stepfather—instructions Alternative House followed—knowing the sexual abuse allegations to be false and despite Gedrich–Lenz's retention of legal custody of Kara during this period. Assuming the truth of this allegation, Bussells' conduct shocks the conscience and plaintiffs therefore state a Fourteenth Amendment substantive due process claim against Bussells.[16] It is plaintiffs' allegation of knowing, intentional, and malicious conduct on Bussells' part in instituting the "no parental contact" restriction, however, that elevates their claim to the constitutional level. Plaintiffs will thus have the significant burden of proving that Bussells had no reason to believe that Lenz sexual-

ly abused Kara and that she restricted Kara's contact with her parents knowing the sexual abuse allegations to be false. Only then would the government's interest in protecting Kara from abuse have no application, rendering the contact restriction baseless and thus conscience-shocking. *See Young v. City of Mount Ranier,* 238 F.3d 567, 574 (4th Cir.2001) ("It is clear that 'liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process,' and that conduct 'intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.'") (citation omitted).

 Next, it is necessary to determine whether Bussells is entitled to qualified immunity for allegedly knowingly putting in place a baseless "no parental contact" restriction. The qualified immunity doctrine "shields from civil damages liability government officials performing discretionary functions so long as the officials' conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Weller v. Dep't of Soc. Servs.,* 901 F.2d 387, 398 (4th Cir.1990). Qualified immunity analysis calls for a two-step inquiry. First, it is necessary to determine whether, taken in the light most favorable to plaintiffs, the facts alleged show that Bussells' conduct violated plaintiffs' constitutional right. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If this first step in the analysis is satisfied, it is then necessary to determine whether the right at issue was clearly established at the time of the violation. *Id.* To qualify as clearly established, "the right must be sufficiently

---

**15.** *See* Va.Code § 16.1–228.

**16.** Plaintiffs do not allege that Spell had any part in ordering the "no parental contact"

restriction, and hence plaintiffs fail to state a substantive due process claim against Spell in this regard.

clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

■■■■ As discussed above, the first step is satisfied by the allegation that Bussells knowingly put in place the "no parental contact" restriction without a reasonable suspicion of abuse because this alleged conduct shocks the conscience. This allegation provides a basis for a substantive due process claim. With respect to the second step, in deciding whether the right at issue was clearly established at the time of the violation, "the right must be defined 'at a high level of particularity.'" *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir.2003) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 250–51 (4th Cir.1999)). Although the contours of the substantive due process right may be difficult to discern, "[t]he relevant dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151; *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir.1992) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."). Thus, the appropriate question is whether, at the time Bussells put in place and maintained the "no parental contact" restriction *i.e.*, from November 22, 2000 through December 8, 2000, it was clearly established that a social worker could not constitutionally sever parental contact with a child without a reasonable basis to suspect parental abuse.[17] The caselaw makes clear that this principle was clearly established; it is clear that plaintiffs' right to be free from parental contact restrictions imposed without court order, probable cause, or exigent circumstances was clearly established at the time of the violation.[18] If plaintiffs' allegations are true, then Bussells did not simply make a bad guess in a gray area, but instead transgressed a bright constitutional line.[19]

17. While ordinarily courts in the Fourth Circuit "need not look beyond the decisions of the Supreme Court, [the Fourth Circuit] court of appeals, and the highest court of the state in which the case arose" to determine whether a right was clearly established at the time of the claimed violation, "the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity.... [Q]ualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations." *Wilson*, 337 F.3d at 402 (internal citations and quotation marks omitted).

18. The Fourth Circuit has found that removing a child from his parent's custody does not shock the conscience if supported by some evidence of abuse. *See Weller*, 901 F.2d at 391. Other courts that have addressed the issue agree that removal of a child must be justified by a reasonable suspicion of abuse in order to withstand a substantive due process claim. *See, e.g., Brokaw v. Mercer County*, 235 F.3d 1000, 1019 (7th Cir.2000); *Miller v. City of Philadelphia*, 174 F.3d 368, 377 (3d Cir. 1999); *Croft v. Westmoreland County Children & Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997); *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996); *Coleman v. New Jersey Division of Youth and Family Servs.*, 246 F.Supp.2d 384, 389 (D.N.J.2003). While a "no parental contact" restriction is not identical to removal, it is certainly analogous in that its effects are the same. Like removal from custody, such a restriction denies parents the ability to have any contact with their child. At the time of Bussells' action, the law was clear that a required predicate of a child's removal from his parent's custody is a reasonable suspicion of abuse. Because a "no parental contact" restriction is the functional equivalent of removal, Bussells cannot circumvent the consequences of proceeding with no evidence of abuse simply because a "no parental contact" restriction is not, strictly speaking, a removal.

19. Again, it is important to note that plaintiffs' allegation involves Bussells' instituting the no contact restriction knowing the abuse

In summary, then, plaintiffs state a § 1983 substantive due process claim against Bussells (but not Spell) based on knowingly putting in place and maintaining the "no parental contact" restriction from November 22, 2000 until December 8, 2000. And, it is also clear that, while Bussells is entitled to absolute immunity for her conduct in the actual preparation and filing of the emergency removal petition in the J & DR Court as well as her decision to seek emergency removal of Kara on December 8, 2000, she is not entitled either to qualified immunity or absolute immunity for instituting the "no parental contact" restriction while investigating the possibility that a removal petition should be filed. Thus, plaintiffs substantive due process claim against Bussells for the "no parental contact" restriction survives defendant's threshold attack. It bears repeating, however, that this claim will fail if it is ultimately determined that Bussells had articulable evidence giving rise to a reasonable suspicion of sexual abuse by Lenz.

*(b) Reed–Hall, Sullivan, Fowler, and DiPinto*

■ Plaintiffs allege that Reed–Hall, Sullivan, Fowler, and DiPinto "maliciously denied [Kara] contact with her parents and siblings," ¶ 221 Third Amended Compl., and that Reed–Hall "routinely verbally, assaulted, harassed, and unlawfully confined" Kara. ¶ 222. Significantly, these defendants did not become involved in Kara's case until after legal custody of Kara had temporarily transferred to Fairfax County.[20] After entry of the December 14, 2000 consent order, the County and its employees had the legal right to determine Kara's placement and visitation schedule and thus did not unlawfully sever contact between Kara and her family or unlawfully confine her.[21] Thus, plaintiffs fail to state a substantive due process claim against Reed–Hall, Sullivan, Fowler, and DiPinto.

*2. Alternative House, El–Sayed, and Raphael*

■ To state a claim under 42 U.S.C. § 1983, a plaintiff must allege "(1)

---

allegations against Lenz to be false. If Bussells reasonably, but mistakenly, concluded that probable cause or exigent circumstances existed and thus acted in a manner she reasonably believed to be lawful, she would be entitled to qualified immunity and could not be held personally liable. *See Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("The relevant question in this case ... is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the] warrantless search to be lawful, in light of clearly established law *and the information the searching officers possessed.*") (emphasis added). Thus, the information possessed by the official in question is critical in determining whether a reasonable official could have believed the challenged conduct was lawful.

**20.** Under Virginia law, legal custody of a child is defined as that

legal status created by court order which vests in a custodian the right to have physi-

cal custody of the child, to determine or redetermine where and with whom she shall live, the right and duty to protect, train and discipline her and to provide her with food, shelter, education, and ordinary medical care, all subject to any residual rights and responsibilities.

Va.Code § 16.1–228.

**21.** Nor are plaintiffs' allegations of verbal harassment sufficient to state a constitutional substantive due process violation. *See, e.g., Costello v. Mitchell Public School Dist. 79,* 266 F.3d 916, 921 (8th Cir.2001) (finding that teacher berating student in front of class does not amount to a substantive due process violation); *Abeyta v. Chama Valley Indep. Sch. Dist.,* 77 F.3d 1253, 1258 (10th Cir.1996) (holding that teacher repeatedly calling student a prostitute and turning a deaf ear while her classmates did the same does not constitute a substantive due process violation).

that the conduct complained of was committed by a person acting under color of state law; and (2) that this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cohen v. Philadelphia,* 736 F.2d 81, 83 (3d Cir.1984) (citing *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)). Alternative House, El–Sayed, and Raphael contend that because Alternative House is a private institution, the substantive due process claim against them must be dismissed because they were not acting under color of state law. The "color of state law" requirement is equivalent to the state action requirement under the Fourteenth Amendment. *Haavistola v. Community Fire Co. of Rising Sun, Inc.,* 6 F.3d 211, 215 (4th Cir.1993). The requirement excludes from the reach of § 1983 all "merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999), but includes within its scope "apparently private actions which have a 'sufficiently close nexus' with the State to be 'fairly treated as that of the State itself.' " *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir.2003) (citing *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).

▮ Plaintiffs allege that Bussells told Alternative House employees to prevent Kara from having any contact with Gedrich–Lenz or Lenz during her stay at Alternative House. Plaintiffs allege that this "no parental contact" policy was not initiated by Alternative House, but was instead initiated and carried out at the behest of the state. Therefore, assuming the truth of this allegation, Alternative House and its employees acted under color of state law in enforcing Bussells' "no parental contact" restriction. *Cf. Jackson,* 419 U.S. at

357, 95 S.Ct. 449 (finding no state action on the part of a heavily regulated utility company, noting that state approval of a certain practice *at the request of* the regulated utility "where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into 'state action' ").

▮ The next step in the § 1983 analysis is to determine whether plaintiffs state a substantive due process claim against Alternative House, El–Sayed, and Raphael. In this regard, plaintiffs allege that Alternative House routinely denied Gedrich–Lenz and Lenz's requests to have contact with Kara during the period November 22, 2000 through December 8, 2000, and prevented Kara from attending a Thanksgiving dinner, despite Gedrich–Lenz's retention of legal custody of Kara during this period. With respect to the Thanksgiving dinner, Alternative House's own records, attached as exhibits to Plaintiffs' Memoranda in Opposition to Alternative House and El–Sayed's Motion to Dismiss, indicate that an Alternative House employee attempted to contact Bussells after Kara requested that she be allowed to visit with her family. Receiving no return call from Bussells, Alternative House denied Kara's request. As neither the County nor Alternative House had legal custody of Kara at this time, they had no right to restrict Kara's contact with her parents, absent a reasonable suspicion of sexual abuse. Plaintiffs allege that both Raphael and El–Sayed agreed to implement Bussells' "no parental contact" restriction, as well as notify other staff of the policy. Because Bussells allegedly lacked a reasonable suspicion of abuse, Raphael and El–Sayed's enforcement of the policy shocks the conscience and states a Fourteenth Amendment substantive due process claim.[22]

22. Neither El–Sayed or Raphael are entitled to qualified immunity from suit as they are

■ Yet, the analysis does not end here as Alternative House, El–Sayed, and Raphael do not simply attack plaintiffs' complaint on a motion to dismiss; in the alternative, they move for summary judgment. In support of their motion for summary judgment, both El–Sayed and Raphael submitted sworn affidavits in which they each state that while working at Alternative House, they met with Kara regularly and that "[s]he complained of having been sexually abused by her step-father, Enrique Lenz, and demonstrated certain destructive behaviors, such as self-mutilation, smoking and low self-esteem." *See* ¶ 6, Affidavit of Samir El–Sayed; ¶ 6, Affidavit of Elana Raphael. Plaintiffs did not submit a sworn affidavit from Kara refuting El–Sayed and Raphael's account.[23] As a result, Alternative House, El–Sayed, and Raphael are entitled to summary judgment on plaintiffs' substantive due process claim because these defendants had an independent and reasonable basis to believe that Kara had been sexually abused by her stepfather—the words from Kara's own mouth. Unlike the plaintiffs' allegations concerning Bussells, there is no allegation that El–Sayed and Raphael knew the abuse allegations were false; indeed the record reflects the contrary; therefore it does not shock the conscience that they followed Bussells' "no parental contact" restriction, particularly in light of their awareness that CPS was conducting a sexual abuse investigation.

### 3. AFGC, Farge, Piedmont, Stickley, and Villeneuve

■ According to the complaint, AFGC was the organization (with Farge as its director) that coordinated Kara's foster care placement on December 15, 2000 at Reed–Hall's request. Similarly, Piedmont and its staff's involvement in Kara's case did not occur until December 18, 2000, the date Kara was placed at Piedmont. Fairfax County had legal custody of Kara on both December 15 and December 18, 2000. Thus Kara's foster care placement and subsequent confinement at Piedmont was not unlawful. As such, plaintiffs § 1983 claim based on allegations that these defendants "routinely verbally assaulted, harassed, and unlawfully confined" Kara is without merit, as fails to state a substantive due process violation.

### D. Procedural Due Process (Count II)

■ In order to state a procedural due process claim, plaintiffs "must demonstrate that 'there exists a liberty or property interest which has been interfered with by the State' and that 'the procedures attendant upon that deprivation' were constitutionally deficient." *Barefoot v. City of Wilmington*, 306 F.3d 113, 124 (4th Cir.

---

not government officials. Although private actors may be deemed government actors if a sufficiently close nexus exists between the private action at issue and the state, they are not entitled to qualified immunity as a matter of law. *See Wyatt v. Cole*, 504 U.S. 158, 169, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) ("[T]he nexus between private parties and the historic purposes of qualified immunity is simply too attenuated to justify such an extension of our doctrine of immunity.").

23. Plaintiffs received proper *Roseboro* notice of the opportunity and necessity of responding to Alternative House, El–Sayed, and Raphael's summary judgment motion, but did not file any counter-affidavits with respect to the matters contained in the affidavits of El–Sayed and Raphael. *See Roseboro v. Garrison*, 528 F.2d 309, 309 (4th. Cir.1975) (prohibiting entry of summary judgment based on *pro se* party's failure to submit affidavits unless *pro se* litigant is given a reasonable opportunity to file counter-affidavits or other appropriate materials and is informed that failure to file such a response may result in dismissal of the action). Although no counter-affidavits were filed, plaintiffs did submit records from Alternative House in support of their allegations in opposition to defendants' motion for summary judgment.

2002) (citation omitted). The thrust of plaintiff's procedural due process claim stems from the termination of contact between Kara and her parents from November 22, 2000 until February 21, 2001. As noted in the discussion of plaintiffs' substantive due process claim, plaintiffs have a liberty interest in familial integrity and privacy. *See Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (finding that natural parents have a "fundamental liberty interest ... in the care, custody, and management of their child); *Hodge v. Jones*, 31 F.3d 157, 163 (4th Cir.1994) (recognizing the right to familial integrity and privacy); *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir.1994) ("The bonds between parent and child are, in a word, sacrosanct, and the relationship between parent and child inviolable except for the most compelling reasons.").

 Insofar as plaintiffs claim Kara was placed at Alternative House without due process of law, they fail to state a procedural due process claim because Gedrich–Lenz, not the County of any of its employees, signed the admissions paperwork admitting Kara to Alternative House on November 22, 2000. Plaintiffs do state a procedural due process claim, however, against Bussells, Alternative House, El-Sayed, and Raphael for the "no parental contact" restriction put in place during Kara's stay at Alternative House from November 22, 2000 until December 8, 2000. During this period, Bussells had yet to obtain a removal order or take emergency custody of Kara pursuant to Va.Code § 16.1–228, and accordingly had no authority to sever parental contact with Kara. Bussells' "no parental contact" restriction was thus put in place without judicial authorization and without due process of law.

 Plaintiffs also state a procedural due process claim against Bussells insofar as they allege she submitted know-ingly false statements in her affidavit in support of emergency removal to the J & DR Court. *See Brokaw v. Mercer County*, 235 F.3d 1000, 1020 (7th Cir.2000) ("[N]o matter how much process is required, at a minimum it requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents."); *id.* at 1021 ("Because [plaintiff] claims that he was removed based on knowingly false statements of child neglect ... he has stated a procedural due process claim."). As discussed earlier, however, because the submission of the affidavit pertains to Bussells' filing of the petition in the J & DR Court, Bussells is absolutely immune from suit in this regard. *See Vosburg v. Dep't of Soc. Servs.*, 884 F.2d 133, 135 (4th Cir.1989) (granting absolute immunity from suit under § 1983 to social workers with respect to their conduct in preparing and filing a removal petition).

 Plaintiffs fail to state a procedural due process claim for Bussells and Spell's delay in seeking judicial authorization for their December 8, 2000 emergency removal of Kara, as Virginia law allows the state to remove a child without prior judicial authorization provided such authorization is sought within 72 hours. *See* Va.Code § 16.1–228; *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir.1994) (holding the Virginia statute, specifically the 72–hour delay, to be constitutional). Bussells and Spell sought judicial authorization for their emergency removal of Kara on December 11, 2000—three days after they took emergency custody of Kara, in compliance with Virginia law.

 Finally, plaintiffs also fail to state a procedural due process claim against Raphael, Reed–Hall, Sullivan, Fowler, Di-Pinto, AFGC, Farge, Piedmont, Beavers, Stickley, and Villeneuve. Significantly, these defendants' involvement in Kara's case did not occur until after Kara's legal

custody had temporarily transferred to the County. Gedrich–Lenz voluntarily relinquished legal custody of Kara to the County pursuant to the December 14, 2000 consent order. This consent order vested the County with the authority to determine "where and with whom [Kara] shall live." *See* Va.Code § 16.1–228 (defining legal custody). As a result, plaintiffs cannot now claim that defendants confined Kara or determined her visitation privileges without due process of law. *See Weller v. Dep't of Social Servs.*, 901 F.2d 387, 393 (4th Cir.1990) (holding that a father failed to demonstrate a due process violation when he voluntarily relinquished custody and management of his son to the State, finding that "[i]f one voluntarily surrenders a liberty interest to the State, there has been no 'deprivation' of that interest by the State, and no due process violation").

In summary, plaintiffs state a § 1983 procedural due process claim (i) against Bussells, Alternative House, El–Sayed, and Raphael for the "no parental contact" restriction put in place during Kara's stay at Alternative House; and (ii) against Bussells for knowingly submitting false statements in her affidavit in support of Kara's emergency removal to the J & DR Court. Bussells, however, is entitled to absolute immunity with respect to this second claim. As a result, only the first procedural due process claim survives threshold scrutiny.

### E. First and Ninth Amendments (Count III)

In Count III, plaintiffs allege (1) that Fairfax County (and its employees Bussells, Reed–Hall, and Sullivan) and Piedmont (and its employees Beavers, Stickley, and Villeneuve) violated their right to association with each other; and (2) that Fairfax County, Piedmont, and their respective employees "maliciously retaliated" against Kara for speaking with an attorney of her choice.

■ These allegations are essentially a restatement of plaintiff's claims in Counts I and II relating to the acts that occurred while Kara was at the Piedmont facility. Because Fairfax County had legal custody of Kara during her placement at Piedmont, pursuant to an agreed order between Gedrich–Lenz and the County, it follows that defendants did not violate the First and Ninth Amendments in placing Kara at Piedmont and determining her visitation privileges. Under Virginia law, legal custody of a child "vests in a custodian the right to have physical custody of the child, [and] to determine or redetermine where and with whom she shall live." Va.Code § 16.1–228. Thus, Count III must be dismissed.

### F. Fourth Amendment (Count IV)

#### 1. Fairfax County, Bussells, Alternative House, El–Sayed, and Raphael

■ The Fourth Amendment protects individuals from "unreasonable searches and seizures by government officials and those private individuals acting as 'instrument[s] or agent[s]' of the Government." *United States v. Jarrett*, 338 F.3d 339 (4th Cir.). The Fourth Amendment right to be free from unreasonable government seizures is a personal one. *See Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."). As such, Kara is the only plaintiff who can state a Fourth Amendment claim in this matter. Plaintiffs allege that Fairfax County and Bussells conspired with Alternative House, El–Sayed, and Raphael to sever contact between Kara and her parents and to "seize and retain" Kara by deceiving Gedrich–Lenz and Lenz into believing they would provide

Kara with treatment services. A person has been "seized" within the meaning of the Fourth Amendment if, in view of all the circumstances surrounding the incident, a reasonable person would believe he was not free to leave. *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Insofar as plaintiffs allege a Fourth Amendment violation for the "no parental contact" policy in and of itself, their claim fails because a no contact restriction does not amount to a seizure of the parents under the Fourth Amendment.

■ Kara, however, states a Fourth Amendment claim against Alternative House, El–Sayed, Raphael, and Bussells for their denial of her request to leave Alternative House to attend Thanksgiving dinner with her family. Plaintiffs allege that Alternative House staff, following Bussells' "no parental contact" directive, prevented Kara from leaving to attend a Thanksgiving dinner, even though Gedrich–Lenz had legal custody of Kara at the time. For § 1983 liability, the seizure in question must be unreasonable. In the context of removing a child from her home and family, a seizure is reasonable if (1) it is pursuant to a court order; (2) it is supported by probable cause; or (3) it is justified by exigent circumstances, meaning that state officers " 'have reason to believe that life or limb is in immediate jeopardy.' " *Brokaw v. Mercer County,* 235 F.3d 1000, 1010 (7th Cir.2000) (internal citations omitted). There was no court order in effect at the time Kara's request to attend Thanksgiving dinner was denied. As discussed earlier, however, El–Sayed and Raphael in their unrefuted affidavits submitted in support of their motion for summary judgment state that Kara told them she was sexually abused by her stepfather—a fact that independently gives Alternative House reasonable grounds to check with Bussells and deny Kara's request to attend Thanksgiving dinner. As a result, the Alternative House defendants are entitled to summary judgment on plaintiffs' Fourth Amendment claim.

■ Plaintiffs Fourth Amendment claim against Bussells, however, survives. Bussells was allegedly instrumental in causing Kara's seizure. Through the "no parental contact" restriction she allegedly put in place, Bussells set in motion a series of events that she knew or reasonably should have known would cause Alternative House to deprive Kara of her constitutional rights. *See Morris v. Dearborne,* 181 F.3d 657, 672 (5th Cir.1999) ("[T]he requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights."). Bussells was not acting pursuant to a court order at the time, and plaintiffs allege that she had no reason to believe Kara was sexually abused by Lenz and in fact knew Kara suffered abuse.

■ Plaintiffs further state a valid Fourth Amendment claim against Bussells and Spell for their removal of Kara from Gedrich Lenz's custody on December 8, 2000 on the premise that Kara had been abused and neglected, despite their alleged knowledge to the contrary. If plaintiffs allegations are true, Bussells and Spell's removal of Kara was unauthorized because it was not supported by probable cause or justified by exigent circumstances. As discussed earlier, however, Bussells and Spell are absolutely immune from suit with respect to their actions in seeking emergency removal of Kara and hence this claim cannot go forward. *See supra* Section C.1(a).

2. *Reed–Hall, Sullivan, Harrold, Di-Pinto, AFGC, Farge, Piedmont, Beavers, Stickley, and Villeneuve*

■ Plaintiffs fail to state a Fourth Amendment claim against any defendants

for the "no parental contact" restriction in place, or Kara's confinement, from December 8, 2000 until February 21, 2001, because Fairfax County had legal custody of Kara during this period. On December 14, 2000, Gedrich–Lenz entered into an agreed order with the County, granting temporary custody of Kara to Fairfax County. Accordingly, all placements occurring after the December 14, 2000 consent order were made pursuant to Virginia law and DFS and its staff were authorized to determine appropriate residential placements, visitation, and medical care for Kara. *See* Va.Code § 16.1–228 (defining "legal custody").

To sum up, then, Kara states a valid § 1983 Fourth Amendment claim against Bussells for the denial of her request to leave Alternative House to attend Thanksgiving dinner with her family. Alternative House, El–Sayed, and Raphael, however, are entitled to summary judgment on this claim. Finally, while plaintiffs also state a § 1983 Fourth Amendment claim against Bussells and Spell for seeking and obtaining emergency removal of Kara. Despite their alleged knowledge that Kara was not an abused and neglected child, both Bussells and Spell are absolutely immune for taking these steps; therefore this claim fails.

## G. *Rehabilitation Act of 1973 (Count V)*

■ Section 504 of the Rehabilitation Act states that

No otherwise qualified individual with a disability ... shall, solely by reason of her ... disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a). To establish a Rehabilitation Act claim, a plaintiff must prove that she was discriminated against "*due to discrimination* solely on the basis of the

disability." *Sellers by Sellers v. School Bd. of City of Manassas, Virginia,* 141 F.3d 524, 528 (4th Cir.1998).

■ In this regard, plaintiffs allege that defendants Fairfax County, AFGC, and Piedmont deprived and conspired to deprive Kara of her "right to be placed in the least restrictive environment," discriminated against her by not allowing her to participate in community based programs, and prevented her from deriving the benefits of certain programs and services that others similarly situated are afforded. ¶ 249, Third Amended Compl. Plaintiffs make no allegation that Kara is disabled or that her disability was the reason for any discrimination that occurred. Accordingly, plaintiffs fail to state a Rehabilitation Act claim against any defendants.

## H. *Supervisory Liability (Count VI)*

■ Supervisory liability is "ultimately determined by pinpointing the persons in the decision-making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994). Typically, "this issue is ... one of fact, not law." *Id.* at 799. There are three necessary elements to establish a claim of supervisory liability under § 1983: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'; (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Id.*

Plaintiffs allege that defendants Fairfax County, Paige, Fowler, Sullivan, Spell, and

Harrold "routinely failed to act or intervene" despite plaintiffs' requests that they discipline their subordinates for their allegedly "unlawful and unconstitutional conduct" and that these defendants "ignored and refused to investigate" this conduct. ¶ 254, Third Amended Compl. As discussed earlier, plaintiffs fail to state any valid constitutional claims for acts arising from DFS's placement decisions after December 11, 2000—the date Fairfax County assumed legal custody over Kara. As a result, plaintiffs fail to state supervisory liability claims against Fowler, the program manager of the Foster Care Division, or Sullivan, a supervisor in the Foster Care Division, because their involvement in the case occurred after the transfer of legal custody to the County.

While plaintiffs allege that Spell, a CPS supervisor, along with Bussells, decided to take emergency custody of Kara on December 8, 2000, they make no allegation that prior to that date, Bussells was engaging in a pattern of egregious behavior posing a risk of a constitutional violation such that Spell could fairly be described as "deliberately indifferent" to that risk, or that citizens were facing a "pervasive and unreasonable risk" of constitutional violations. *See Carter v. Morris*, 164 F.3d 215, 221 (4th Cir.1999) (holding that evidence of only one prior incident similar to the violation alleged in the complaint was insufficient to establish supervisory liability).

Finally, plaintiffs make no allegations with respect to Paige or Harrold's role in the removal decision, nor do they make any allegation that either of them had any knowledge of Spell or Bussells' decision to remove Kara on December 8, 2000. As a result, plaintiffs' fail to state a supervisory liability claim against any of these defendants.

## I. Municipal Liability (Count VII)

Municipal entities "do not enjoy absolute immunity under the Eleventh Amendment," *Weller v. Dep't of Social Servs.*, 901 F.2d 387, 398 (4th Cir.1990), and thus may be sued under § 1983. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To establish municipal liability in an action under § 1983 for unconstitutional acts by a municipal employee below the policymaking level, "a plaintiff must show that the violation of his constitutional rights resulted from a municipal policy or custom." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir.1996). Municipalities cannot be held liable under a theory of *respondeat superior* for the constitutional violations of their employees acting within the scope of their employment. *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir.1987). A § 1983 plaintiff must therefore adequately plead and ultimately prove three elements: (1) the existence of an official policy or custom (2) that is fairly attributable to the municipality (3) that proximately caused the underlying constitutional violation. *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir.1994). These requirements apply not only in actions against local governments, but also in actions against individually-named municipal agents sued in their official capacities. *See Monell*, 436 U.S. at 690 n. 55, 98 S.Ct. 2018.

While a municipal policy is found most readily in municipal ordinances and regulations, "it may also be found in formal or informal *ad hoc* 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy." *Spell*, 824 F.2d at 1385. Municipal custom or usage may also serve as a basis for the imposition of municipal liability and the existence of such a custom "may be found in 'persistent and widespread ... practices of [municipal] officials [which] [a]lthough not authorized by written law,

[are] so permanent and well-settled as to [have] the force of law.'" *Id.* at 1386. Although Fairfax County correctly points out that an isolated incident or a meager history of isolated incidents is insufficient to prove the existence of an official policy or custom, *see Doe v. Broderick,* 225 F.3d 440, 456 (4th Cir.2000), its argument is premature on a motion to dismiss and thus unpersuasive. To withstand a motion to dismiss under Rule 12(b)(6), plaintiffs must allege no more than one incident of misconduct, which they have done here. *Jordan,* 15 F.3d at 337. Likewise, plaintiffs need not detail the facts underlying their claims or plead the multiple incidents of constitutional violation necessary at later stages to establish the existence of an official policy or custom and causation. *Id.* at 339. Plaintiffs must only comply with the "usual requirements of notice pleading specified by the Federal Rules." *Id.*[24]

In this respect, plaintiffs allege that Fairfax County had a policy or custom of severing contact between children and their families, failing to adequately train employees to follow the Constitution and stated policies, and failing to adequately handle complaints regarding employees' unconstitutional conduct.[25] ¶¶ 258–61, Third Amended Compl. Plaintiffs further allege a practice of using interview techniques that "validate an allegation of sexual abuse rather than to engage in disciplined and objective fact finding." [26] ¶ 266.

In analyzing plaintiffs' municipal liability claims, it is first necessary to determine whether plaintiffs' complaint states any underlying constitutional violations sufficient to impose municipal liability. As previously discussed, plaintiffs state a Fourteenth Amendment substantive and procedural due process claim against Bussells for the "no parental contact" restriction she put in place from November 22, 2000 until December 8, 2000. Plaintiffs also state a Fourteenth Amendment substantive and procedural due process claim against Bussells and Spell for taking emergency custody of Kara on December 8, 2000, knowing the sexual abuse allegations to be false.[27] Finally, plaintiffs

---

**24.** In *Jordan,* the plaintiffs alleged that the following policies proximately caused the violation of their constitutional rights: (1) "the County defendants maintained a policy of providing inadequate training to their employees both on how to determine whether a summary removal was proper and on the statutory procedural requirements following removal;" (2) that "the defendants encouraged the removal of any child left alone, regardless of the circumstances, and trained their employees accordingly;" (3) "that County defendants condoned and ratified the improper and overreaching conduct of their social workers." 15 F.3d at 340.

The Fourth Circuit concluded that
these allegations are sufficient to provide the County defendants notice of the nature of the claim against them and the grounds on which it rests, and it does not appear beyond doubt that there is no set of facts which the Jordans could prove in support of this claim which would entitle them to relief.
*Id.*

**25.** Plaintiffs also name defendants Paige, Spell, Fowler, Sullivan, and Harrold under the municipal liability portion of their complaint, essentially restating their supervisory liability claim against these defendants. As a municipal liability claim against individual government agents must be pursued against them in their official capacity and "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent," the discussion proceeds only with reference to defendant Fairfax County. *See Monell,* 436 U.S. at 690 n. 55, 98 S.Ct. 2018.

**26.** While this allegation is made as part of plaintiffs "gross negligence" claim, it is more readily treated as a claim under their municipal liability cause of action.

**27.** Although Bussells and Spell are immune from suit for their actions in this regard, *see supra* Section C.1(a), municipalities do not share the immunity of their agents, even though an immunity defense may protect individual municipal agents in their personal

state a Fourth Amendment claim against Bussells for Kara's "Thanksgiving seizure" and against Bussells and Spell for their emergency removal of Kara on December 8, 2000 without probable cause or exigent circumstances.[28] Next, it is necessary to assess whether the municipal policies or customs plaintiffs allege could have proximately caused these constitutional violations. An alleged policy of severing contact between children and families could have caused Bussells to institute the "no parental contact" restriction, even without a reasonable suspicion that Kara had been sexually abused by Lenz. In turn, Bussells' "no parental contact" restriction proximately caused the Thanksgiving seizure. Similarly, an alleged policy of using interview techniques to validate sexual abuse could proximately cause caseworkers like Bussells to institute "no parental contact" restrictions and take emergency custody of children without a reasonable suspicion of sexual abuse.

 Similarly, plaintiffs allegations of the County's failure to train its employees also provides sufficient causation. Failure to train municipal employees is a valid theory to establish municipal liability. *See Spell v. McDaniel,* 824 F.2d 1380, 1389 (4th Cir.1987). If a municipal employee violates another's constitutional rights, the municipality can be held liable if it had a policy or custom of failing to train its employees and that failure to train caused the constitutional violation, providing the failure to train amounts to deliberate indifference. *Collins v. City of Harker Heights,* 503 U.S. 115, 123–24, 112 S.Ct.

1061, 117 L.Ed.2d 261 (1992); *Jordan,* 15 F.3d at 341. If plaintiffs can prove, at the summary judgment stage or at trial, that the County was deliberately indifferent in training employees, like Bussells, on the requirements of the Constitution and the need to follow it, or that the County failed to train employees regarding the handling of complaints of unconstitutional conduct, then these failures could have caused Bussells to put the "no parental contact" restriction in place lacking a reasonable suspicion of abuse and without due process of law, and could have resulted in the restriction's being kept in place.[29] Thus, plaintiffs' municipal liability allegations set forth, as they must, a basis other than *respondeat superior* for the imposition of municipal liability. As a result, plaintiffs' municipal liability claim against Fairfax County survives threshold review.

*J. State Law Claims*

Plaintiffs advance four state law tort claims in their complaint: (1) intentional infliction of emotional distress; (2) gross negligence; (3) malicious prosecution; and (4) malpractice. Before delving into the specifics of each claim, it is necessary to determine whether Fairfax County is amenable to suit on state tort law claims.

 The doctrine of sovereign immunity is "alive and well" in Virginia. *Niese v. City of Alexandria,* 264 Va. 230, 564 S.E.2d 127, 132 (2002). In Virginia, it is well established that "the sovereign is immune ... from actions at law for damages" and that this protection "extends to

---

capacities against a damage award. *See Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

**28.** Again, Bussells and Spell are personally immune from suit in this regard, *see supra* Section C.1(a), but the municipality does not share this immunity. *See supra* note 26.

**29.** Plaintiffs allege that various supervisors routinely ignored their many written and oral complaints. If plaintiffs can later show ignorance of similar complaints of unlawful official conduct, such a showing may be sufficient to prove that the County was indifferent to or condoned such behavior. *See Carter v. Morris,* 164 F.3d 215, 219 (4th Cir.1999).

municipalities in the exercise of their government functions." *Carter v. Morris*, 164 F.3d 215, 221 (4th Cir.1999). A function is governmental if "directly tied to the health, safety, and welfare of the citizens." *Niese*, 564 S.E.2d at 131.[30] As all of plaintiffs' claims involve the County's actions in the area of child protection, Fairfax County is entitled to the protection of sovereign immunity on all of plaintiffs' state tort law claims. Therefore, plaintiffs' state tort law claims against the County must be dismissed.

### 1. Intentional Infliction of Emotional Distress (Count VIII)

■■■■■ To state a claim for intentional infliction of emotional distress, a plaintiff must plead and ultimately prove by clear and convincing evidence that (1) "the wrongdoer's conduct is intentional or reckless; (2) the conduct is outrageous and intolerable; (3) the alleged conduct and emotional distress are causally connected; (4) and the distress is severe." *Delk v. Columbia/HCA Healthcare Corp.*, 259 Va. 125, 523 S.E.2d 826, 833 (2000).[31] Furthermore, a plaintiff is required to "allege each of these elements with the requisite degree of specificity." *Id.*

■■■■■ Plaintiffs fail to allege these four elements with the requisite degree of specificity. Plaintiffs allege that Paige,

Spell, Bussells, Fowler, Sullivan, Reed–Hall, Harrold, DiPinto, Alternative House, El–Sayed, Raphael, AFGC, Farge, Piedmont, Beavers, Stickley, and Villeneuve's "extreme and outrageous conduct" caused the plaintiffs "extreme emotional distress in mental and physical injury." ¶ 263, Third Amended Compl. Plaintiffs cursory intentional infliction of emotional distress claim is made in one lone sentence with no factual elaboration. *See* ¶ 263, Third Amended Compl. Accordingly, plaintiffs intentional infliction of emotional distress claim must be dismissed in its entirety as to all defendants.[32]

### 2. Gross Negligence (Count IX) [33]

#### (a) Paige, Spell, Bussells, Fowler, Sullivan, and Reed–Hall

■■■■■ The doctrine of sovereign immunity does not shield state employees from liability for acts or omissions constituting gross negligence. *James v. Jane*, 221 Va. 43, 282 S.E.2d 864, 869 (1980) ("A state employee who acts wantonly, or in a culpable or grossly negligent manner is not protected [by sovereign immunity]"). Gross negligence is defined as that degree of negligence "which shows indifference to others, disregarding prudence to the level that safety of others is completely neglected. Gross negligence is negligence which

---

**30.** By contrast, when a municipality performs a proprietary or commercial function, it is not entitled to sovereign immunity. *Niese*, 564 S.E.2d at 132.

**31.** Earlier Virginia cases further define the second prong of an intentional infliction of emotional distress claim as requiring conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Russo v. White*, 241 Va. 23, 400 S.E.2d 160, 162 (1991) (internal quotation marks omitted).

**32.** This claim must also be dismissed as to all County defendants sued in their official capacity because, in Virginia, a municipality cannot be held liable for the intentional torts of its employees committed during the performance of a governmental function. *Niese*, 564 S.E.2d at 133.

**33.** The gross negligence claims against DiPinto, El–Sayed, Farge, Piedmont, Beavers, Stickley, and Villeneuve are discussed *infra* as malpractice claims because these defendants are healthcare providers and tort claims against such individuals or entities are properly considered malpractice claims. *See* Va. Code § 8.01–581.1.

shocks fair-minded people, but is less than willful recklessness." *Wilby v. Gostel,* 265 Va. 437, 578 S.E.2d 796, 801 (2003). Whether certain behavior constitutes gross negligence is "generally a factual matter for resolution by the jury and becomes a question of law only when reasonable people cannot differ." *Koffman v. Garnett,* 265 Va. 12, 574 S.E.2d 258, 260 (2003).

▇ Plaintiffs allege that Paige, Spell, Bussells, Fowler, Sullivan, and Reed–Hall used interview techniques and other practices to validate an allegation of sexual abuse rather than engage in disciplined and objective fact finding. However, in their complaint, plaintiffs do not allege that Paige, Spell, Fowler, Sullivan, or Reed–Hall ever interviewed Kara and fail to specify what other practices validating sexual abuse were allegedly utilized.[34]

▇ Plaintiffs do allege, however, that on November 29, 2000, Bussells tape-recorded an interview with Kara in which Bussells "coercively phrased and manipulatively styled questions ... attempt[ing] to persuade Kara into making false allegations of sexual abuse against Lenz" and "refused to accept Kara's answers since they either denied or failed to support Bussells['] accusations of sexual abuse against Lenz." ¶ 73, Third Amended Compl. In describing what actually took place during the Bussells interview, how-ever, plaintiffs fail to allege any conduct on Bussells' part that would rise to the level of gross negligence.[35] Furthermore, plaintiffs do not allege any damage resulting from the use of such interview techniques as plaintiffs themselves state that "[d]espite this pressure, Kara never accused Lenz of abusing her or being inappropriate toward her." ¶ 73.

▇ With the exception of plaintiffs' claim that Reed–Hall and Sullivan were grossly negligent in creating a Foster Care Service Plan for Kara "based on false and misleading facts, as well as failure to include mandated parental input," ¶ 271, the rest of plaintiffs' gross negligence claims against these County defendants all involve allegations of intentional conduct. *See* ¶¶ 269–70. As a claim of gross negligence must be based on "negligence which shocks fair-minded people, but is less than willful recklessness," these allegations fail to state a claim for gross negligence and consequently must be dismissed. *See Wilby v. Gostel,* 265 Va. 437, 578 S.E.2d 796, 801 (2003).

▇ As for the claim against Reed–Hall and Sullivan with respect to the Foster Care Service Plan, plaintiffs have not alleged facts giving rise to a claim of more than simple negligence[36] against these defendants anywhere in their complaint. *See*

---

**34.** Plaintiffs cursory reference to "overall practices" lacks the necessary specificity to evaluate whether plaintiffs state a claim for gross negligence in this regard. *See* ¶ 266.

**35.** Plaintiffs allege that "Bussells made statements to Kara about specific topics such as, how she stylized her bikini line and the size and color of her breasts, and encouraged Kara to corroborate" her statements, and that "Bussells repeatedly asked questions about the topics asking Kara 'what she thought' Lenz meant [to which] Kara consistently replied 'I don't know' and Bussells presented possible scenarios where Kara repeatedly replied 'I guess' and 'are you done yet.' " ¶ 73.

Plaintiffs further allege that "Bussells encouraged Kara to refute Lenz'[s] statements surrounding the facts of events and conversations that had occurred between Kara and her stepfather where Kara refused [sic]. Bussells continually asked Kara to remember 'anything' so she [Bussells] 'could determine whether Lenz'[s] behavior was inappropriate or not.' " *Id.*

**36.** As County employees performing a government function, Sullivan and Reed–Hall are entitled to sovereign immunity for claims of simple negligence. *See James v. Jane,* 221 Va. 43, 282 S.E.2d 864, 869 (1980).

¶ 196 (detailing plaintiffs allegations regarding the Foster Care Service Plan). As a result, plaintiffs' fail to state a gross negligence claim against Reed–Hall and Sullivan for their creation of Kara's Foster Care Service Plan.

### (b) Alternative House, El–Sayed, and Raphael

 To be held liable for negligence, defendants must first owe a duty of care to plaintiffs. The duty alleged must be one that arises from common law, not contract. *See Holles v. Sunrise Terrace, Inc.,* 257 Va. 131, 509 S.E.2d 494, 497 (1999). Alternative House is not a health care provider owing Kara a duty of care arising from a professional relationship. The source of plaintiffs relationship with Alternative House was contractual. Gedrich–Lenz signed Kara into Alternative House and, in turn, Alternative House agreed to allow Kara to reside there for a short period of time. Because Alternative House's duty to plaintiffs was a contractual one, plaintiffs cannot maintain an action for gross negligence against Alternative House. *See Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.,* 256 Va. 553, 507 S.E.2d 344, 347 (1998) (holding that tort action based solely on negligent breach of a contractual duty with no common law duty cannot be maintained).

 With respect to El–Sayed and Raphael, plaintiffs allege that they used interview techniques lacking in objectivity, skill, or sensitivity to validate an allegation of sexual abuse [37] and that they "maliciously, and in bad faith, documented, produced, and published statements" about Lenz, falsely identifying him as a "sexual abuse perpetrator." *See* ¶¶ 266–67, Third Amended Compl. Both of these allegations fail to state a claim for gross negligence. Plaintiff's first allegation fails be-

cause El–Sayed and Raphael's interview techniques did not proximately cause their alleged damages. Plaintiffs contend that their damages were the "deprivation of familial relations, integrity and association, as well as aggravation, humiliation, embarrassment, harm to their reputations, and severe emotional distress." ¶ 273. Yet, it was El–Sayed and Raphael's decision to adhere to Bussells' "no parental contact" restriction that deprived the plaintiffs of their right to familial relations, not their interviewing skills. Accordingly, plaintiffs' second claim against El–Sayed and Raphael fails because it alleges intentional, not grossly negligent, conduct. *See Wilby,* 578 S.E.2d at 801 (defining gross negligence).

### (c) AFGC

 Plaintiffs make two gross negligence claims against AFGC. First they allege that AFGC used interview techniques that validated sexual abuse allegations and, second, that AFGC "maliciously and in bad faith, documented, produced, and published statements about Enrique Lenz falsely accusing and identifying him as a 'sexual abuse perpetrator' despite evidence to the contrary." ¶ 267, Third Amended Compl. Plaintiffs fail to state a gross negligence claim against AFGC on the first allegation because AFGC did not proximately cause their alleged damages. AFGC's involvement in this case did not begin until Fairfax County already had legal custody of Kara. Accordingly, the proximate cause of Kara's separation from her parents was the December 14, 2000 consent order signed by Gedrich–Lenz, not AFGC's interview techniques. Plaintiffs also fail to state a claim for gross negligence on the second allegation because it alleges intentional conduct. *See Wilby,* 578 S.E.2d at 801.

---

**37.** In contrast to a similar claim against Bussells, however, plaintiffs fail to specify in their complaint what such techniques were or which interviews they are referring to.

### 3. Malicious Prosecution (Count X)

■■■■■ Plaintiff Lenz alleges that Bussells, Spell, and Reed–Hall "maliciously and in bad faith, intentionally continued to pursue prosecuting" him. ¶ 275, Third Amended Compl. Lenz cannot maintain a malicious prosecution action against these defendants because they are protected by sovereign immunity. Virginia retains its immunity from "[a]ny claim arising out of the institution or prosecution of any judicial or administrative proceeding, even if without probable cause." *Snyder v. City of Alexandria*, 870 F.Supp. 672, 691 (E.D.Va.1994) (citing Virginia Tort Claims Act, Va.Code § 8.01–195.3(6)). These County defendants were acting in their governmental capacity when they committed any acts in connection with the alleged "prosecution" of Lenz, and thus are immune from suit for malicious prosecution.

■■■■■ Quite apart from immunity, Lenz's claim for malicious prosecution fails for yet another reason; namely failure to state a claim. In malicious prosecutions stemming from civil proceedings, a plaintiff must allege and prove arrest of his person, seizure of his property, or some special injury. *Ayyildiz v. Kidd*, 220 Va. 1080, 266 S.E.2d 108, 111 (1980). Nowhere in the Third Amended Complaint does Lenz allege any arrest of his person, seizure of his property, or special injury.

### 4. Malpractice (Count XI)

■■■■ Under Virginia law, malpractice is defined as "any tort based on health care or professional services rendered ... by a health care provider, to a patient." Va.Code § 8.01–581.1. A health care provider is

(i) "any person, corporation, facility, or institution licensed by this Commonwealth to provide health care or professional services as a physician ... clinical psychologist, clinical social worker, professional counselor ... who provides services on a fee basis; ... (vi) a corporation, partnership, limited liability company or any other entity, except a state-operated facility, which employs or engages a licensed health care provider and which primarily renders health care services; ... or (vii) a director, officer, employee, independent contractor, or agent of the persons or entities referenced herein, acting within the course and scope of his employment or engagement as related to health care or professional services."

Va.Code § 8.01–581.1. Thus, all tort claims based on the provision of health care services against health care providers are considered malpractice claims and are governed by the Virginia Medical Malpractice Act. Conversely, as a result, plaintiffs' claims of gross negligence against health care provider defendants are properly considered malpractice claims.

■■■■ To prevail in an action for professional malpractice, a plaintiff must (1) establish the standard of care, (2) demonstrate that the defendant's actions breached the standard of care and (3) prove that the defendant's breach was the proximate cause of the plaintiff's injuries. *See Seaward International v. Price Waterhouse*, 239 Va. 585, 391 S.E.2d 283, 287 (1990).

#### (a) Bussells, Reed–Hall, and AFGC

■■■■■■ Plaintiffs fail to state a malpractice claim against Bussells, Reed–Hall, and AFGC because none of these defendants are health care providers as defined by Va.Code § 8.01–581.1. Bussells and Reed–Hall are DFS caseworkers, not individuals licensed by Virginia "to provide health care or professional services as a physician ... clinical psychologist, clinical social worker, [or] professional counselor." Va.Code § 8.01–581.1. AFGC is a private, for-profit business that contracts with various counties in Virginia and the District of

Columbia to place adolescent children in foster homes. AFGC also recruits and trains foster care parents, but is not a residential facility. Thus, AFGC is not an entity that "primarily renders health care services," *id.*, and plaintiffs make no allegations to the contrary. As a result, plaintiffs fail to state a malpractice claim against AFGC.

### (b) Alternative House, El–Sayed, and Raphael

In support of their motion for summary judgment, El–Sayed and Raphael submitted sworn affidavits describing Alternative House as "a safe house for at-risk youths and their families" that "does not provide medical services, therapy or treatment programs." ¶ 3, Affidavit of Samir El–Sayed; ¶ 3, Affidavit of Elana Raphael. As there is no evidence to the contrary,[38] it appears that Alternative House is not an entity that "primarily renders health care services" and accordingly plaintiffs cannot pursue a malpractice claim against it. Furthermore, in their sworn affidavits, both El–Sayed and Raphael state that they were not licensed nor did they at any time act in the capacity of or hold themselves out as psychiatrists, psychologists, social workers, professional counselors "or any other medical or health professional listed in 8.01–581.1 *et seq.* of the Code of Virginia." ¶ 2, Affidavit of Samir El–Sayed; ¶ 2, Affidavit of Elana Raphael. As no evidence to the contrary has been presented,[39] El–Sayed and Raphael are entitled to summary judgment on plaintiffs' malpractice claim.

### (c) DiPinto

DiPinto is a medical doctor at Woodburn, a community health facility that is a Fairfax County agency. Plaintiffs allege that instead of properly evaluating Kara, DiPinto failed to exercise reasonable care within the standard of her profession and "rubber-stamped" DFS's request for a certificate of need for residential treatment, which resulted in Kara's placement at Piedmont. As a medical doctor, DiPinto is a health care provider under the Virginia Medical Malpractice Act. Va.Code § 8.01–581.1. This claim involves a physician's treatment of a specific patient. As a result, DiPinto is not entitled to sovereign immunity despite being a County employee because the state's interest and involvement in the treatment of a specific patient is minimal and the state exercises little control over a physician's treatment decisions. *See James v. Jane*, 221 Va. 43, 282 S.E.2d 864, 870 (1980).

If plaintiffs' allegation regarding the certificate is true, DiPinto's "rubber-stamping" might well be a deviation from the appropriate standard of care for a physician in DiPinto's position. Moreover, the issuance of this certificate proximately caused Kara's placement at Piedmont because without it, DFS presumably could not have placed her there. Therefore, Kara states a valid malpractice claim against DiPinto.

### (d) Piedmont, Beavers, Stickley, Villeneuve, and Farge

Piedmont Behavioral Health Center and its employees Beavers, Villeneuve, and Stickley meet the statutory definition for health care providers. Defendants describe Piedmont as a "private health care facility...that provides a wide range of therapeutic and treatment services by a multi-disciplinary team under the direction of a full-time psychiatrist." Beavers is the chief operating officer of Piedmont; Villeneuve is a doctor who also served as the clinical director; and Stick-

---

**38.** *See supra* note 23.

**39.** *See supra* note 23.

ley was a therapist assigned to Kara's care. Nevertheless, plaintiffs fail to state a malpractice claim against any of the Piedmont defendants because they fail to allege with any degree of specificity how Kara was injured or damaged as a result of defendants' alleged conduct.[40] An essential element of a claim for professional malpractice is that the defendant's breach proximately caused some injury to the plaintiff. *Seaward International v. Price Waterhouse*, 239 Va. 585, 391 S.E.2d 283, 287 (1990). As plaintiffs fail to allege any such injury under their malpractice claim, their claim cannot go forward against the Piedmont defendants. For the same reason, plaintiffs also fail to state a malpractice claim against Farge of AFGC, although she is a licensed social worker and thus might well be a healthcare provider under the Act.

In summary, then, Kara states a valid malpractice claim against DiPinto for her alleged "rubber-stamping" of a DFS request for a certificate of need for residential services. She fails, however, to state a malpractice claim against Bussells, Reed–Hall and AFGC because they are not health care providers under the Virginia Medical Malpractice Act. Similarly, Alternative House, El–Sayed, and Raphael are entitled to summary judgment on this claim because they also do not meet the statutory definition of a health care provider. Kara also fails to state a malpractice claim against Piedmont, Beavers, Stickley, Villeneuve, and Farge because, though these defendants likely meet the statutory definition of a health care provider, plaintiffs do not allege any injury that was proximately caused by their alleged malpractice.

## V.

In summary, Count I of plaintiffs' Third Amended Complaint is dismissed as to all defendants except Bussells, Alternative House, El–Sayed, and Raphael for their implementation of the "no parental contact" restriction from November 22, 2000 until December 8, 2000, though Alternative House El–Sayed, and Raphael are entitled to summary judgment on this claim.

Count II is dismissed as to all defendants except Bussells, Alternative House, El–Sayed, and Raphael for the "no parental contact" restriction from November 22, 2000 until December 8, 2000.

Count III is dismissed in its entirety.

Count IV is dismissed as to all defendants except Bussells, Alternative House, El–Sayed, and Raphael for Kara's "Thanksgiving seizure," however Alternative House, El–Sayed, and Raphael are entitled to summary judgment on this claim.

Count V is dismissed in its entirety.

Count VI is dismissed in its entirety.

Count VII states a claim for municipal liability against Fairfax County.

Count VIII is dismissed is in its entirety.

Count IX is dismissed in its entirety.

Count X is dismissed in its entirety.

Count XI is dismissed as to all defendants except DiPinto for her role in "rubber-stamping" a DFS request for a certificate of need for residential services for Kara, and Alternative House, El–Sayed,

---

**40.** Moreover, assuming the injury to be Kara's placement at Piedmont, the conduct of the Piedmont defendants did not proximately cause Kara's placement. The December 14, 2000 consent order granted Fairfax County custody of Kara and, as such, the County had the legal right to place her at Piedmont. Furthermore, it appears that plaintiffs allege that DiPinto's certificate was a necessary predicate to Kara's placement at Piedmont. Any interview techniques used by the Piedmont staff to "validate" the sexual abuse allegations were therefore not the cause, proximate or otherwise, of Kara's placement at Piedmont.

and Raphael, who are instead entitled to summary judgment on this claim.

An appropriate order will issue.